**UNITED STATES of America,**
**Plaintiff–Appellant,**

v.

**Donald Eric GUIMOND; Paschalis**
**Tsilias, Defendants–Appellees.**

No. 95–6207.

United States Court of Appeals,
Sixth Circuit.

Argued May 23, 1996.

Decided June 17, 1997.

Rehearing and Suggestion for Rehearing
En Banc Denied July 23, 1997.

---

Christopher E. Cotten, (argued and briefed), Office of the U.S. Attorney, Memphis, TN, for Plaintiff–Appellant,

Doris A. Randle–Holt, (argued and briefed), Office of the Federal Public Defender, Memphis, TN, Paula Skahan, (argued and briefed), Thompson & Skahan, Memphis, TN, for Defendants–Appellees.

Before: RYAN and NORRIS, Circuit Judges; DOWD, District Judge.*

## OPINION

ALAN E. NORRIS, Circuit Judge.

The United States appeals from the district court's order granting defendants' motion to suppress evidence seized during a warrantless search of a vehicle belonging to defendant, Donald Eric Guimond. We reverse and remand to the district court for further proceedings consistent with this decision.

### I.

On January 5, 1995, Guimond was stopped for speeding by Deputy Sheriff Charles Tartera, who worked with the Sheriff's Department Drug Interdiction Unit in Memphis, Tennessee. When he was stopped, Guimond was driving on Interstate 40 in a mini-van bearing Quebec license plates, and he was travelling sixty-five miles-per-hour in a fifty-five mile-per-hour zone. Defendant, Paschalis Tsilias, was sitting in the front passenger seat of the mini-van. A video camera equipped with a digital clock was installed in

* The Honorable David D. Dowd, Jr., United States District Judge for the Northern District of Ohio, sitting by designation.

Deputy Tartera's squad car, and it recorded both the stop, and the subsequent conversation between Tartera and Guimond.

Deputy Tartera pulled the mini-van over just before 2:30 p.m. Shortly thereafter, and before Tartera reached the mini-van, Guimond exited from the driver's side. At 2:30:15, Tartera asked Guimond to sit in the back seat of the squad car, and he requested Guimond's driver's license. Guimond entered the squad car, produced a valid Quebec license and told Tartera that he and Tsilias had vacationed in Los Angeles for a few days and that they were on their way home. At 2:31:40, Tartera told Guimond that he would issue him a traffic warning citation rather than a violation notice for speeding. While Tartera was completing the warning citation, he asked Guimond about his travel plans and route. Guimond stated that he was unsure about their exact route because his passenger, Tsilias, was in charge of the map. Tartera asked if the passenger had "helped him drive." Although Guimond's answer could not be heard on the videotape, Tartera testified that Guimond replied in the affirmative.

At 2:36:40, Deputy Tartera handed the citation book to Guimond and asked him to read and sign it, which was standard procedure. Tartera then stated that he was going to ask Tsilias a few questions and check his driver's license. Leaving Guimond in the back seat of the squad car, Tartera approached the passenger side of the mini-van in order to speak with Tsilias. Tsilias told the officer that he had no driver's license, that he had not been driving, and that he was "just co-piloting for Guimond." Otherwise, Tsilias corroborated Guimond's statement as to where they had been and where they were going. While Tartera was speaking with Tsilias, he noticed that the mini-van's spare tire was inside the vehicle, rather than in its proper storage compartment, and that the vehicle had only two rows of seats, rather than three.

Tartera returned to the squad car approximately two minutes after he left to question Tsilias. Tartera reported Tsilias' statements to Guimond and told Guimond that he was confused because he understood Guimond to have said earlier that Tsilias had helped him with the driving. Guimond responded that what he meant was that Tsilias had helped with the driving by being a "co-pilot type of operator," and that he had helped with directions. Around that time, Guimond returned the citation book with the signed citation to Tartera. Tartera then asked if Guimond had any drugs or weapons in the mini-van. Guimond replied in the negative. Tartera asked if Guimond would mind if he "had a look inside." Guimond gave oral and written permission to search while he was still seated in the back seat of the squad car.

Another officer arrived to assist Tartera in searching the mini-van. When Tartera opened the passenger-side sliding door, he noticed that the van had been modified and the floor had been raised. Tartera then looked underneath the vehicle and saw welds that had not been made at the factory. In the rear of the van, Tartera noticed a "trap door." He opened it, discovering a compartment which contained what was later determined to be approximately eighty-two kilograms of cocaine. Guimond and Tsilias were arrested and taken to the sheriff's office. At the sheriff's office, Guimond was advised of his *Miranda* rights, and he gave a statement of admission. Both defendants were subsequently indicted for knowingly and intentionally possessing with the intent to distribute approximately eighty-two kilograms of cocaine, in violation of 21 U.S.C. § 841(a)(1), and for aiding and abetting each other in doing so, in violation of 18 U.S.C. § 2.

Defendants moved to suppress the evidence obtained in the search of Guimond's mini-van. Guimond also moved to suppress the admission he made following the search. Defendants' motions were referred to a magistrate judge. The magistrate judge's report and recommendation concluded that Tartera had completed his investigation regarding Guimond's alleged speeding before he left the squad car to question Tsilias, because he had already checked Guimond's driver's license, verified that the vehicle was registered in Guimond's name, obtained negative results on a computer check for outstanding warrants, and decided to issue only a warning citation. The magistrate judge further concluded that no reasonable suspicion of

criminal activity based upon specific and articulable facts existed at that time, and that Tartera had no justification for leaving Guimond in the squad car while he went to question Tsilias. In the magistrate judge's view, since there was no reason to hold Guimond while Tartera went to question Tsilias, Guimond was being illegally detained in the squad car, and since Guimond's consent to search the mini-van was given while he was being illegally detained, it was not voluntary. The magistrate judge then concluded that Guimond's subsequent confession was given without any intervening circumstances breaking the causal connection between the illegal detention and the confession, and that the confession was therefore inadmissible as the "fruit" of an illegal arrest.

For these reasons, the magistrate judge recommended that Guimond's motion to suppress be granted. He recommended that Tsilias' motion to suppress be denied, however, because Tsilias had only a limited interest in the mini-van, lacked a legitimate expectation of privacy therein, and consequently had no standing to object to the search. The district court issued an order adopting the magistrate's report and recommendation in its entirety with respect to defendant Guimond's motion. On the issue of Tsilias' standing to object to the search, the district court rejected the magistrate judge's recommendation, finding that Tsilias did have such standing. The government has not appealed that ruling.

## II.

■ In reviewing a district court's ruling on a motion to suppress, we must accept the court's findings of fact unless they are clearly erroneous, and we review its legal conclusions de novo. *United States v. Dotson,* 49 F.3d 227, 229 (6th Cir.), *cert. denied,* — U.S. —, 116 S.Ct. 141, 133 L.Ed.2d 87 (1995). In reviewing the court's factual findings, we will consider "the evidence in the light most likely to support the district court's decision." *United States v. Roark,* 36 F.3d 14, 16 (6th Cir.1994) (quoting *United States v. Williams,* 962 F.2d 1218, 1221 (6th Cir.1992)).

■ Ordinarily, whether "a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances." *United States v. Rose,* 889 F.2d 1490, 1494 (6th Cir.1989) (quoting *Schneckloth v. Bustamonte,* 412 U.S. 218, 227, 93 S.Ct. 2041, 2047–48, 36 L.Ed.2d 854 (1973)). However, when, as here, the district court determines the validity of a consent to search based upon the application of an overriding legal principle, we review the lawfulness of the search de novo.

### A.

■ We first conclude that the district court erred in making at least one factual determination which appears to have been crucial to its conclusion that Guimond was in a state of illegal detention at the time he consented to a search of his mini-van. Among the findings of the magistrate judge (which were adopted by the district court) were the following:

> Deputy Tartera has pointed to no reason (other than curiosity) for going to the mini-van to talk to Tsilias. However, *at that point,* he placed Guimond in the back of his squad car, and locked him in. This, it is submitted, constituted an arrest.

(emphasis added). The district court went on to find that because probable cause was lacking for the "arrest," Guimond's subsequent detention was illegal.

The above-quoted passage suggests that Guimond was placed in the squad car after Tartera had filled out the warning citation and decided to walk over to the mini-van and talk to Tsilias. The videotape clearly demonstrates, however, that Guimond was already in the squad car, and that there was no escalation in confinement when Tartera left Guimond where he was and went to talk to Tsilias. Thus, the district court's factual finding that Guimond's confinement to the squad car did not occur until the investigation of the traffic violation had been completed, or was nearly completed—a finding criti-

cal to the court's conclusion that Guimond was illegally detained—is clearly erroneous.[1]

## B.

■ We further conclude that the district court erred when it ruled that Guimond's consent to search was invalid because it was obtained while Guimond was being illegally detained. We must consider the validity of a consent to search in the context of a traffic stop in light of the Supreme Court's recent decision in *Ohio v. Robinette,* — U.S. —, 117 S.Ct. 417, 136 L.Ed.2d 347 (1996).

In *Robinette,* a deputy sheriff stopped the defendant for driving in excess of the posted speed limit. After he ran a computer check which indicated no previous violations, the deputy asked the defendant to step out of his car, issued a verbal warning, and returned the defendant's driver's license. He then asked the defendant whether he had any illegal weapons or drugs in the car. When the defendant answered "no," the deputy obtained his consent to search the car, subsequently discovering a small amount of drugs. The defendant challenged the constitutionality of the search, claiming that his consent was not voluntary because the officer failed to advise him that he was free to leave before he asked for consent to search the car. The Supreme Court of Ohio held that the search violated the Fourth Amendment because it was the result of an unlawful detention. *State v. Robinette,* 73 Ohio St.3d 650, 653 N.E.2d 695 (1995). Ohio's high court went on to establish a per se rule that "[a]ny attempt at consensual interrogation must be preceded by the phrase 'At this time you legally are free to go' or by words of similar import." 73 Ohio St.3d at 650–51, 653 N.E.2d at 696.

On appeal, the Supreme Court reaffirmed its longstanding view that analysis under the Fourth Amendment must focus on the overall reasonableness of the police officer's actions, and that it is improper to distill the reasonableness inquiry into a bright-line rule, "in recognition of the 'endless variations in the facts and circumstances' implicating the Fourth Amendment." *Robinette,* — U.S. at ——, 117 S.Ct. at 421 (quoting *Florida v. Royer,* 460 U.S. 491, 506, 103 S.Ct. 1319, 1329, 75 L.Ed.2d 229 (1983)). The Court rejected the per se rule adopted by the Supreme Court of Ohio, holding that "[t]he Fourth Amendment test for a valid consent to search is that the consent be voluntary, and '[v]oluntariness is a question of fact to be determined from all the circumstances.'" *Id.* (quoting *Schneckloth v. Bustamonte,* 412 U.S. 218, 248–49, 93 S.Ct. 2041, 2059, 36 L.Ed.2d 854 (1973)). Accordingly, the Court remanded the case to the state court for further proceedings. *Id.*

*Robinette* represents the Supreme Court's fourth attempt to point out that per se or bright-line rules are inconsistent with that court's Fourth Amendment jurisprudence. *See Florida v. Bostick,* 501 U.S. 429, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991) (rejecting per se rule that questioning aboard a bus always constitutes a seizure); *Michigan v. Chesternut,* 486 U.S. 567, 108 S.Ct. 1975, 100 L.Ed.2d 565 (1988); and *Schneckloth,* 412 U.S. at 218, 93 S.Ct. at 2043 (rejecting per se rule that consent cannot be valid unless defendant knew he had right to refuse). In each of these cases, the Court reiterated that *the Fourth Amendment requires consideration of all of the circumstances surrounding the encounter in question.*

In this case, *Robinette* counsels that the validity of Guimond's consent to search the mini-van depends upon whether his consent, when considered in light of all of the circumstances surrounding the traffic stop, was truly voluntary, i.e., whether Guimond felt coerced into giving his consent. Thus, the district court's legal conclusion in this case—that the consent was invalid because it occurred during an illegal detention—is overly

---

1. The facts presented do not make clear whether the investigation of the traffic violation was complete when Tartera left the squad car to question Tsilias, but Tennessee law does require an officer to obtain the driver's signature on the citation when he issues a violation notice. Tenn.Code. Ann. § 55–10–207 (1996). While the statute does not state what is required when a mere warning citation is issued, it appears that Tennessee practice requires a warning to be in writing and to be at least presented to the driver. *See State v. Protzman,* No. 02C01–9105–CR–00115, 1992 WL 124456 (Tenn.Crim.App.1992).

broad in that it applies a bright-line rule in a case implicating Fourth Amendment subtleties. Accordingly, we remand this cause to the district court in order that it may determine whether Guimond's consent was voluntary, based upon all of the circumstances surrounding the encounter between defendants and Deputy Tartera.

Because the district court's underlying factual finding regarding when Guimond was placed in the squad car was erroneous, the court on remand should first reexamine its conclusion that Guimond was in a state of illegal detention at the time he consented to the search. We emphasize that the court would not have to conclude that Guimond's consent was involuntary if it decided that he was being illegally detained at the time he gave the consent. Guimond was detained after the traffic encounter concluded for no more than two or three minutes before he gave his consent to search. This time frame includes the two minutes during which Deputy Tartera was out of the squad car questioning Tsilias, and approximately thirty seconds after his return to the squad car. The time frame should not be the sole determining factor in evaluating the voluntariness of Guimond's consent, however, as it was not lengthy and the events which occurred therein were not particularly confrontational. More important than the brief detention is Guimond's state of mind, i.e., whether he felt coerced into giving his consent. The district court is, of course, free to entertain additional evidence if it believes such evidence would be helpful in gaining a full understanding of the facts and circumstances of the encounter.

### C.

Finally, we note that our holding here is consistent with our recent, but pre-*Robinette*, decision in *United States v. Mesa*, 62 F.3d 159 (6th Cir.1995). In *Mesa*, we held that a search following a consent obtained from a woman who had been detained in the back seat of a squad car was invalid. Unlike the facts in the instant case, those in *Mesa* clearly indicated that the original objective of the traffic stop had ended well before the defen-

dant provided her consent, and that the defendant knew she was locked in the vehicle and was not free to leave. The defendant signed the warning citation and handed it back to the officer, who would not let her leave the vehicle but continued to ask her several questions. Although the precise duration of the detention is unclear, we noted that the defendant was detained "for a considerable period of time," and that she was very nervous. *Mesa*, 62 F.3d at 163. Under those circumstances, we held that the defendant's consent to search was not validly obtained.

While we did state in *Mesa* that "[o]nce the purposes of the initial traffic stop were completed, there is no doubt that the officer could not further detain the vehicle or its occupants unless something that occurred during the traffic stop generated the necessary reasonable suspicion to justify a further detention," *Mesa*, 62 F.3d at 162, we read that passage as applying to the facts of that case, not as holding that consent is per se invalid in all cases where it is obtained after the conclusion of legitimate detention.[2] Thus, it appears that *Robinette* would not dictate a different result in *Mesa*.

### III.

The district court's order is **reversed**, and this cause is **remanded** to the district court for further proceedings consistent with this decision.

---

**2.** To the extent that the above-quoted passage could be read as implying the existence of a bright-line rule, it is likely rendered inapplicable by *Robinette*.