*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2003 FED App. 0336P (6th Cir.)
File Name: 03a0336p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

UNITED STATES OF AMERICA,
 *Plaintiff-Appellant,*

 *v.*

DAVID LOPEZ-ARIAS and
ANTONIO EGUES,
 *Defendants-Appellees.*

No. 02-5154

Appeal from the United States District Court
for the Western District of Kentucky at Louisville.
No. 00-00094—Thomas B. Russell, District Judge.

Argued: May 2, 2003

Decided and Filed: September 19, 2003

Before: CLAY and GIBBONS, Circuit Judges;
CLELAND, District Judge.[*]

———————————

 [*] The Honorable Robert H. Cleland, United States District Judge for
the Eastern District of Michigan, sitting by designation.

———————————

**COUNSEL**

**ARGUED:** Nina Goodman, UNITED STATES
DEPARTMENT OF JUSTICE, Washington, D.C., for
Appellant. Patrick J. Bouldin, WESTERN KENTUCKY
FEDERAL COMMUNITY DEFENDER, INC., Louisville,
Kentucky, Martin N. Kute, Louisville, Kentucky, for
Appellees. **ON BRIEF:** Nina Goodman, UNITED STATES
DEPARTMENT OF JUSTICE, Washington, D.C., Terry M.
Cushing, ASSISTANT UNITED STATES ATTORNEY,
Louisville, Kentucky, for Appellant. Patrick J. Bouldin,
WESTERN KENTUCKY FEDERAL COMMUNITY
DEFENDER, INC., Louisville, Kentucky, Martin N. Kute,
Louisville, Kentucky, for Appellees.

———————————

**OPINION**

———————————

 JULIA SMITH GIBBONS, Circuit Judge. Federal drug
enforcement agents arrested defendants-appellees David
Lopez-Arias and Antonio Egues for trafficking in cocaine.
After a federal grand jury indicted them, defendants moved to
suppress certain evidence, alleging that it was obtained as a
result of an unlawful arrest. The district court granted
defendants' motion to suppress, and the government appeals
from that ruling. For the following reasons, we affirm the
district court's decision to suppress the evidence.

**I.**

 On or shortly before July 26, 2000, law enforcement
officials in Louisville, Kentucky, received a tip from a
confidential informant, whose reliability had not yet been
tested, that two Hispanic men from Las Vegas were traveling
to Louisville to distribute cocaine. The informant told the

police that the two men intended to stay at the Collier Motel in Louisville and that a man named Jose intended to deliver the proceeds of a drug sale to these two men at the motel. According to the informant, Jose would be driving a white Toyota with a certain license plate number. A search of state motor vehicle records revealed that the license plate number identified by the informant was registered to Jose Barrera Santiesteban, 104 E. Kingston, Apt. 1, Louisville, Kentucky.

The federal Drug Enforcement Administration (DEA) began surveillance of the Collier Motel on the afternoon of July 26, 2000. During their surveillance, DEA agents discovered that a 1992 blue Ford Crown Victoria, which was parked in front of Room 17 of the motel, was registered to David Lopez-Arias, whose address matched Santiesteban's except for the apartment number. At around 4:00 p.m. on July 26, defendants Lopez-Arias and Egues exited Room 17 and departed in the Crown Victoria. The undercover DEA agents followed defendants as they visited several locations, including an office supply store, where they purchased a set of digital scales of the type often used to weigh drugs. Defendants then returned to the motel.

At around 8:15 that evening, Santiesteban arrived at the motel driving the white Toyota described by the informant. After speaking with Lopez-Arias, who was outside working on the Crown Victoria, Santiesteban went into Room 17 with Lopez-Arias. DEA agents observed Santiesteban carrying a yellow plastic bag into Room 17. Santiesteban stayed in Room 17 for about forty-five minutes before leaving in his white Toyota. DEA agents followed Santiesteban out of the vicinity of the motel and then stopped him. A drug-sniffing dog alerted on the Toyota, but the DEA agents did not find any drugs in the Toyota.

Defendants departed from the motel in the Crown Victoria shortly after Santiesteban and were followed by DEA agents. Once the drug-sniffing dog alerted on Santiesteban's Toyota, a DEA agent on the scene with Santiesteban ordered the DEA

agents following defendants to stop the Crown Victoria. Four DEA agents in four unmarked DEA vehicles activated their sirens and emergency lights and stopped the Crown Victoria. The four DEA agents, with weapons drawn, ordered defendants to exit the Crown Victoria. The DEA agents then handcuffed defendants and placed them into separate DEA vehicles. The DEA agents drove the defendants from the scene of the stop on the street to an adjacent convenience store parking lot, where they were removed from the DEA vehicles, read their *Miranda* rights, and questioned separately.

The DEA agent questioning Egues conducted a pat-down search of him and found the motel key in his pocket. Egues stated that the motel room was registered in his name. The DEA agent asked Egues for consent to search the motel room and presented him with a written consent form, which Egues signed within ten to fifteen minutes from the time the DEA agents stopped the Crown Victoria. A little more than twenty minutes from the time the DEA agents stopped the Crown Victoria, Lopez-Arias gave the DEA agent questioning him verbal consent to search the motel room.

After receiving consent from both defendants, DEA agents searched Room 17 of the Collier Motel and found a yellow plastic bag containing twenty-five individually wrapped packages of cocaine, a black notebook containing $4,100 in cash, clear plastic wrappers containing cocaine residue, and two sets of digital scales. DEA agents then formally arrested defendants and reread them their *Miranda* rights.

The federal grand jury charged defendants with possessing more than 500 grams of cocaine with the intent to distribute. Before trial, defendants moved to suppress all the evidence that the DEA agents found in the motel room. Defendants argued that they were arrested without probable cause and that they did not voluntarily grant consent to search the motel room. The district court referred defendants' motion to a magistrate judge, who conducted an evidentiary hearing. The magistrate judge issued proposed findings of fact and

conclusions of law and recommended that the motion to suppress be denied. The magistrate judge found that defendants voluntarily gave their consent to search the motel room during a permissible investigatory detention that had not yet risen to the level of an arrest.

Defendants objected, and the district court rejected the magistrate judge's recommendation and granted defendants' motion to suppress. The district court found that the stop had risen to the level of an arrest by the time defendants gave their consent to search the motel room, that no probable cause existed to support the arrest, and that the consent was therefore tainted by the illegal arrest. Because the district court found that the consent was tainted by the illegal arrest, the district court did not decide whether the consent was otherwise voluntary. The government appeals the district court's ruling to suppress the evidence found in the motel room.

## II.

"This Court reviews the district court's factual findings in a suppression hearing for clear error and reviews the district court's conclusions of law de novo." *United States v. Waldon*, 206 F.3d 597, 602 (6th Cir. 2000). "A factual finding will only be clearly erroneous when, although there may be evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. The evidence is reviewed in the light most likely to support the district court's decision." *United States v. Navarro-Camacho*, 186 F.3d 701, 705 (6th Cir. 1999) (internal citations and quotation omitted). However, "this Court reviews de novo the district court's determination as to whether certain facts establish a seizure or detention in violation of the Fourth Amendment." *Waldon*, 206 F.3d at 602.

### A. The Seizure

The government does not argue that the DEA agents had probable cause to arrest defendants at the time defendants granted their consent to search the motel room. The government instead argues that defendants gave their consent to search the motel room during a permissible investigatory detention that had not yet risen to the level of an arrest.

Since the Supreme Court decided *Terry v. Ohio*, 392 U.S. 1 (1968), courts have recognized that a law enforcement officer who lacks probable cause to justify an arrest may nevertheless briefly detain an individual without violating the Fourth Amendment if the officer possesses a reasonable and articulable suspicion that the individual has committed a crime. *United States v. Heath*, 259 F.3d 522, 528 (6th Cir. 2001). The scope of this brief investigative detention, however, must be limited to "the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." *Florida v. Royer*, 460 U.S. 491, 500 (1983). Although "[t]he scope of the intrusion permitted will vary to some extent with the particular facts and circumstances of each case," in no event may law enforcement officers "seek to verify their suspicions by means that approach the conditions of arrest." *Id.* at 500, 409.

To determine whether an investigative detention has crossed the line and become an arrest, this court considers factors such as "the transportation of the detainee to another location, significant restraints on the detainee's freedom of movement involving physical confinement or other coercion preventing the detainee from leaving police custody, and the use of weapons or bodily force." *United States v. Richardson*, 949 F.2d 851, 857 (6th Cir. 1991). In *Richardson*, this court concluded that law enforcement officers had crossed the line from an investigative detention into an arrest when they placed the defendant in the back of a police car. *Id.* at 857; *see also United States v. Butler*, 223 F.3d 368, 375 (6th Cir. 2000) ("We have long recognized that officers cross the line

from an investigatory stop into an arrest when they place a suspect in a police vehicle for questioning.").

But there is no bright line that distinguishes an investigative detention from an arrest. *Royer*, 460 U.S. at 506 (stating that there is no "litmus-paper test" for distinguishing when a seizure exceeds the bounds of an investigative stop). In *Houston v. Clark County Sheriff Deputy John Does 1-5*, 174 F.3d 809, 814-15 (6th Cir. 1999), a case relied upon heavily by the government, this court went so far as to decide that an arrest had not occurred when multiple police officers stopped two suspects at gunpoint, handcuffed them, and forcibly placed them into police vehicles. This court found that these protective measures were reasonably necessary because in *Houston* the officers, although lacking probable cause, reasonably believed that the suspects had just shot another police officer. *Id.*

In the present case, the district court did not clearly err in finding that before defendants gave their consent to search the motel room, they were (1) stopped by four DEA agents brandishing firearms, (2) handcuffed, (3) placed into the backseats of separate DEA vehicles, (4) transported from the scene of the stop, (5) read their *Miranda* rights, and (6) questioned. The government, relying on *Houston,* argues that all these measures were reasonably necessary for the protection of the DEA agents. The seizure in the present case, however, was more like an arrest than the seizure this court considered in *Houston*. In addition to taking the same protective measures as did the police officers in *Houston*, the DEA agents in the present case transported defendants from the scene of the stop and read them their *Miranda* rights. Each of these additional measures made the seizure more like an arrest. *See Heath*, 259 F.3d at 531 (holding that "an investigative stop must be confined to the site of the initial inquiry"); *United States v. Obasa*, 15 F.3d 603, 608 (6th Cir. 1994) (holding that the reading of *Miranda* rights during a seizure is not dispositive but is evidence that the seizure has crossed the line into an arrest).

Moreover, in this case, defendants were not suspected of anything so dangerous as shooting a police officer, as was the case in *Houston*. In this case, defendants were suspected of possessing illegal drugs, just as were the defendants in *Heath*, *Butler*, and *Richardson*. The seizure in this case was at least as intrusive as the seizures that this court determined were arrests in *Heath*, *Butler*, and *Richardson*. *Heath*, 259 F.3d at 530-31 (recognizing that drug crimes are inherently dangerous but finding that the transport of the suspect constituted an arrest); *Butler*, 223 F.3d at 375 (finding that placing the drug-crime suspect in a police vehicle constituted an arrest); *Richardson*, 949 F.2d at 857 (same). We therefore agree with the district court that the DEA agents had arrested defendants by the time defendants consented to the search of the motel room. Because the DEA agents lacked probable cause, the arrest was unlawful.

**B. The Consent**

The government argues that, even if defendants' consent to search the motel room was granted during an unlawful arrest, the district court nevertheless erred in suppressing the evidence found in the motel room because defendants' consent to search, according to the government, was voluntary. For this argument, the government primarily relies upon *United States v. Guimond*, 116 F.3d 166 (6th Cir. 1997), where this court instructed that even if a consent to search was granted during an illegal seizure, the consent is valid if it was voluntary, *i.e.*, not the result of coercion. *Id.* at 170-71 (citing *Ohio v. Robinette*, 519 U.S. 33, 40 (1996)).

It is without a doubt true that "[t]he Fourth Amendment test for a valid consent to search is that the consent be voluntary." *Robinette*, 519 U.S. at 40. But the Supreme Court has made perfectly clear that the exclusionary rule may operate to exclude evidence obtained as the result of a valid, voluntary consent to search. In order to deter unlawful seizures, the Supreme Court has mandated that courts must generally suppress otherwise admissible evidence obtained as a result

of an illegal seizure. *Brown v. Illinois*, 422 U.S. 590, 602 (1975). Thus, the Court has held that "statements given during a period of illegal detention are inadmissible *even though voluntarily given* if they are the product of the illegal detention and not the result of an independent act of free will." *Florida v. Royer*, 460 U.S. 491, 501 (1983) (emphasis added); *see also Kaupp v. Texas*, – U.S. –, 123 S. Ct. 1843, 1847 (2003) (*per curiam*) (reconfirming "well-established precedent" that requires suppression of a statement given during a period of illegal seizure unless the statement was an act of free will sufficient to purge the primary taint of the unlawful seizure). The Court has applied this analysis to exclude evidence obtained pursuant to a consent to search that was granted during an illegal seizure. *Royer,* 460 U.S. at 507-08.

Therefore, following Supreme Court precedent, we have repeatedly held that if a consent to search is given after an illegal seizure, evidence obtained pursuant to the consent to search must be suppressed, unless the consent is sufficiently attenuated from the illegal seizure such that the consent is the product of an intervening act of free will. *United States v. Caicedo*, 85 F.3d 1184, 1190 (6th Cir. 1996); *Richardson*, 949 F.2d at 858; *United States v. Buchanan*, 904 F.2d 349, 355-56 (6th Cir. 1990). In other words, not only must the consent be valid, *i.e.*, voluntary, as required by *Robinette*, but the causal chain between the illegal seizure and the consent must be broken to avoid the consequences of the exclusionary rule. *Dunaway v. New York*, 442 U.S. 200, 217-19 (1979) (holding that a voluntary statement must be suppressed under the exclusionary rule if it was causally connected to an illegal seizure); *Brown*, 422 U.S. at 602-04 (holding that voluntariness is only a threshold requirement); *Buchanan*, 904 F.2d at 355-56 (suppressing evidence obtained pursuant to a consent to search given during an illegal seizure even though the district court found that the consent was given "freely and voluntarily"); *see also United States v. Santa*, 236 F.3d 662,

676 (11th Cir. 2000) (holding that "a voluntary consent to search does not remove the taint of an illegal seizure").[1]

To determine whether a consent to search was sufficiently attenuated from an illegal seizure such that the causal chain was broken, courts must consider factors such as the length of time between the illegal seizure and the consent, the presence of intervening circumstances, the purpose and flagrancy of the official misconduct, and whether the officers read the suspect his *Miranda* rights before he consented. *Kaupp*, 123 S.Ct. at 1847; *Brown*, 422 U.S. at 603-04 (finding that no single factor is dispositive); *Richardson*, 949 F.2d at 858. The burden of persuasion regarding this issue is on the government. *Kaupp*, 123 S.Ct. at 1847. In the present case, the district court appropriately considered these factors and did not err in finding no intervening act of free will on the part of defendants between their illegal arrest and their consent to search the motel room. Defendants granted their consent to search within half an hour from the initial stop and

---

[1]In *Guimond*, a panel of this court seemingly held that if the consent to search was voluntary, it does not matter that the consent occurred during an illegal seizure. 116 F.3d at 170-71. The panel in *Guimond* did not address the implications of the exclusionary rule nor did it distinguish the Supreme Court's holdings in *Royer*, *Dunaway*, and *Brown* or this court's holdings in *Caicedo*, *Richardson*, and *Buchanan.* The *Guimond* panel relied upon the Supreme Court's 1996 decision in *Robinette*, but *Robinette* did not overrule *Royer*, *Dunaway*, *Brown, Caicedo*, *Richardson*, and *Buchanan*. The *Robinette* Court did not address the issue of an illegal seizure. *Robinette*, 519 U.S. at 35 ("We are here presented with the question whether the Fourth Amendment requires that a *lawfully seized* defendant must be advised that he is 'free to go' before his consent to search will be recognized as voluntary." (emphasis added)). To the extent that *Guimond* conflicts with *Royer*, *Dunaway*, *Brown*, *Caicedo*, *Richardson*, and *Buchanan*, we follow the earlier authorities. *Darrah v. City of Oak Park*, 255 F.3d 301, 310 (6th Cir. 2001) (holding that "when a later decision of this court conflicts with one of our prior published decisions, we are still bound by the holding of the earlier case."); *see also Kaupp*, 123 S.Ct. at 1844 (reconfirming the holding in *Brown* that a statement obtained by exploitation of an illegal arrest may not be used against a criminal defendant).

during the illegal arrest. There was no intervening time or event between the illegal arrest and defendants' consent. *See Buchanan*, 904 F.2d at 356 ("Dissipation of the taint resulting from an illegal entry ordinarily involves showing that there was some significant intervening time, space, or event." (internal quotation and citation omitted)). Furthermore, as the district court found, the illegality of the arrest was blatant. *See Richardson*, 949 F.2d at 859 (finding that placing a suspect into the back of a police car for twenty minutes without probable cause constituted a blatant constitutional violation). Although the DEA agents read defendants their *Miranda* rights, this alone was insufficient to break the causal chain between the illegal arrest and defendants' consent. *Kaupp*, 123 S.Ct. at 1847 (holding that the giving of *Miranda* warnings alone was insufficient to purge the primary taint of the unlawful seizure).

In *Brown*, the Supreme Court held that a separation of less than two hours between an illegal arrest and a voluntary statement was insufficient to break the causal chain between the two when no intervening event of significance had occurred. 422 U.S. at 604. The Court found that under such circumstances, *Miranda* warnings by themselves were insufficient to purge the taint of the illegal arrest. *Id.* at 602. Therefore, the Court ruled that the statement was inadmissible regardless of its voluntariness. *Id.* at 604-05. In *Richardson*, this court held that evidence discovered pursuant to a consent to search was inadmissible because the consent to search was given twenty minutes into a blatantly illegal arrest. 949 F.2d at 859 ("We do not believe that the taint had dissipated after merely twenty (20) minutes of continued improper conduct."). In *Buchanan*, we held that the taint of the illegal seizure was not purged when only approximately one hour passed between the illegal entry and the consent to search. 904 F.2d at 356. As in *Brown*, *Richardson*, and *Buchanan*, in the present case, there was no intervening act of free will sufficient to break the causal chain between defendants' illegal arrest and their consent to search the motel room. Therefore, the district court properly suppressed the evidence

discovered in the motel room pursuant to the exclusionary rule.

### III.

For all the foregoing reasons, we affirm the district court's ruling to suppress the evidence discovered in the motel room.