DECISION AND JUDGMENT ENTRY
{¶ 1} The state of Ohio appeals the judgment of the Lucas County Court of Common Pleas, which granted the motion of appellee, Matthew Cabell, to suppress evidence gathered from his seizure and subsequent searches. For the following reasons, we affirm the trial court's judgment.
 {¶ 2} Appellee was indicted with the following counts: possession of cocaine, a violation of R.C. 2925.11(A) and (C)(4)(a), a felony of the fifth degree; trafficking in marijuana in the vicinity of a juvenile, a violation of R.C. 2925.03(A)(2) and (C)(3)(c) and a felony of the third degree; possession of cocaine exceeding 25 grams but less than 100 grams, a violation a R.C. 2925.11(A) and (C)(4)(c), a felony of the third degree; trafficking in cocaine in the vicinity of a juvenile, a violation of 2925.03(A)(2) and (C)(4)(d), a felony of the second degree.
 {¶ 3} At the hearing on appellee's motion to suppress, four officers who participated in appellee's arrest and the searches of his vehicle and residence testified for the state, and appellee's girlfriend and his girlfriend's daughter, both of whom were present during the arrest and searches, testified on appellee's behalf. Laurie Renz, a detective with the Toledo Police Department's metro drug task force, testified that two confidential informants notified police that appellee was "delivering" cocaine in the area of Lewis Avenue, Alexis, and Laskey Road in Toledo. One confidential informant ("CI") participated in a "controlled buy" of cocaine from appellee on March 2, 2005. Police obtained appellee's identification and residential address from a database search of the license plate of the vehicle used during the buy. Renz did not specify how much cocaine was involved.
 {¶ 4} The next day, March 3, 2005, officers were informed by the second CI that appellee would be delivering cocaine in the area in his "tan van" that day. One officer spotted the van driving on Alexis Road, another officer followed appellee to a Bob Evans parking lot. The van parked; a few moments later, another vehicle arrived in the parking lot. That driver exited his car, got into appellee's van for a few moments, then left the van, and drove his own vehicle out of the lot with appellee following in his van. Appellee never exited the van. The officers did not view any activity inside the van.
 {¶ 5} Officers continued to observe appellee over the next week. On March 7, 2005, appellee was seen driving a blue Lumina in the area of Alexis and Lewis. On March 10, 2005, the first CI informed police that appellee would be making a delivery of cocaine "somewhere" on Lewis Avenue between 6 and 7 p.m. that evening. Renz testified that "our best bet" was to go to appellee's residence and set up surveillance. Appellee resided inside a mobile home park; the park had one driveway exiting the park onto Lewis Avenue. Officers sat in two unmarked cars near the exit of the mobile home park with a view of appellee's residence, and other officers sat in one other unmarked car on Lewis Avenue.
 {¶ 6} At approximately 6:30 p.m., Renz, sitting seven to eight homes away from appellee's home, saw "an individual" leave the home, enter the tan van, and exit the park. As it drove by the detectives, they saw it was "a female" and let the van proceed. The van went to a gas station across Lewis Avenue, returned ten minutes later, and parked in front of the home with its lights on. Another car pulled in next to the van, and Renz saw a person who "appeared to be a male" leave the mobile home and lean into the car's passenger side window of the car. After only a minute or two, the man returned inside the mobile home. Three to five minutes later, Renz saw appellee leave the mobile home and enter the tan van, which began to leave via the driveway.
 {¶ 7} When asked what information from the CI had been corroborated up to that point, Renz only stated that appellee was leaving during the time specified, 6 to 7 p.m. It was at that point that Renz "decided to conduct a traffic stop." She radioed to the other officers that appellee was leaving the mobile home park. Renz stopped her car in front of and next to appellee's van; another detective pulled up behind the van, and a third detective, with another riding along, drove nose towards the van and stopped in front of it.
 {¶ 8} All three police vehicles were unmarked; none of the officers wore uniforms, though some wore their badges around their necks. When the van stopped, hedged in by the unmarked cars, all the officers, including Renz, exited their vehicles with their guns drawn, and approached appellee's van. The van went into reverse briefly, then lurched forward slightly; appellee then exited his van and ran toward the mobile home park's fence. Renz, together with Detective Awls, chased, tackled, then handcuffed appellee. A search of appellee's pockets yielded four individually wrapped bags of cocaine, a bag of marijuana, two cell phones, and some cash. After being Mirandized, appellee was transported to Saint Vincent's hospital for a head wound he received during the arrest.
 {¶ 9} Appellee's girlfriend, Patricia Blackford, was in the passenger seat of the van. She was handcuffed, searched, and Mirandized. Her two children, ages 13 and four, were in the back of the van. It was later revealed that the group was leaving for a restaurant to celebrate the 13 year old's birthday. Renz and the other officers testified that they had not seen anyone except appellee enter the van after Blackford returned from the gas station.
 {¶ 10} Officers gave Blackford a "consent form" to search the mobile home where she and appellee lived. She signed, although at the hearing, she repeatedly asserted that officers had threatened to charge her for drug trafficking and take her children away if she did not consent to the search. It is unclear whether she signed while in handcuffs or after they were removed. Also, she testified at the hearing that, since it was dark and snowy and the officers were in plain clothes and unmarked cars, she and appellee thought they were being robbed when the officers "pinched" their cars and approached with drawn guns. Blackford and her two children accompanied officers back to her mobile home, where a search uncovered more cocaine and marijuana. Appellee was not charged in connection with the controlled buy of March 2; the charges stemmed only from the evidence gathered from appellee's arrest and the searches of the van and his residence.
 {¶ 11} In its decision granting appellee's motion, the trial court relied heavily on our decision in State v. Young, 6th Dist. No. E-04-13, 2005-Ohio-3369, appeal denied by State v.Young (2005), 107 Ohio St.3d 1410, 2005-Ohio-5859. The trial court found that the officers' purpose in "pulling over" appellee was not to conduct an investigatory stop, but rather for the "sole and immediate purpose" of arresting him. It also expressly found that the only facts known to the officers forming probable cause for appellee's warrantless arrest was the "tip" from the informant regarding what appellee would be doing March 10 — namely, delivering drugs "somewhere" on Lewis Avenue between 6 and 7 p.m. The trial court then concluded that the "tip," together with appellee's act of getting into his vehicle and exiting the mobile home park, were insufficient to form the requisite probable cause. All evidence, including the evidence claimed from appellee's residence, was suppressed.
 {¶ 12} The state of Ohio asserts two assignments of error:
 {¶ 13} "I. The court erred in granting the motion to suppress because the officers had probable cause to arrest defendant on the evening of March 10, 2005.
 {¶ 14} "II. The trial court erred in granting the motion to suppress because the officers had reasonable suspicion to stop defendant's vehicle."
 {¶ 15} An appellate court reviews a trial court's decision on a motion to suppress de novo. State v. Bing (1999),134 Ohio App.3d 444, 448, citing Ornelas v. United States (1996),517 U.S. 690, 699. However, the appellate court reviews the facts only for clear error, giving due weight to the trial court as to the inferences drawn from those facts. Id. Accordingly, we must accept the factual determinations of the trial court if they are supported by competent, credible evidence. We must then determine, without deference to the trial court's conclusions, "whether, as a matter of law, the facts meet the appropriate legal standard." State v. Curry (1994), 95 Ohio App.3d 93, 96.
 I. Appellee was "Seized" and not "Stopped." {¶ 16} For ease of analysis, we begin by addressing the state's second assignment of error. Although the state argues that the officers were only required to have reasonable suspicion in order to stop appellee's vehicle, the trial court held that when appellee's vehicle was surrounded by unmarked police cars and could not move, it was a stop made with the intention to arrest and thus required probable cause.
 {¶ 17} The Fourth Amendment permits law enforcement officers to briefly detain a suspect without the detention rising to the level of a formal arrest. There are two types of "stops": the investigatory, or "Terry" stop, Terry v. Ohio (1968),392 U.S. 1, and the traffic stop based upon probable cause that a traffic violation had been committed. Dayton v. Erickson (1996),76 Ohio St.3d 3, syllabus. A Terry stop must be based upon reasonable, articulable suspicion that a particular person has committed or is about to commit a crime. Carroll v. UnitedStates (1925), 267 U.S. 132, 161. The detention must be "reasonably related in scope" to the suspicion, U.S. v. Perez
(2006), 440 F.3d 363, 372, citing Terry, 392 U.S. at 20, and "cannot be excessively intrusive." Bennett v. City ofEastpointe (2005), 410 F.3d 810, 836, citing Berkemer v.McCarty (1984), 468 U.S. 420, 439.
 {¶ 18} As for the circumstances constituting a seizure, "[t]he word `seizure' readily bears the meaning of a laying on of hands or application of physical force to restrain movement, even when it is ultimately unsuccessful." California v. Hodari D.
(1991), 499 U.S. 621, 626. A mere showing to a suspect of law enforcement authority does not constitute a seizure. Id. The "seizure" of an individual takes place when "by means of physical force or a show of authority, his freedom of movement is restrained. Probable cause must support an official seizure of the person, even where the officer does not make a formal arrest." Ingram v. City of Columbus (1999), 185 F.3d 579, 591, citing United States v. Mendenhall (1980), 446 U.S. 544, 553, and Dunaway v. New York (1979), 442 U.S. 200, 207. "It must be recognized that whenever a police officer accosts an individual and restrains his freedom to walk away, he has `seized' that person." Dunaway v. New York (1979), 442 U.S. 200, 207, quotingTerry, 392 U.S. at 16.
 {¶ 19} When determining whether a "seizure" has been effectuated, the pertinent inquiry is not the subjective intentions of the police officer at the time. Rather, "the only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation." Berkemer v.McCarty (1984), 468 U.S. 420, 442. A suspect is "in custody" when a reasonable person in his place would not feel free to leave or go where he pleases. Oregon v. Mathiason (1977),429 U.S. 492, 495, citing Orozco v. Texas (1969), 394 U.S. 324. The test to be applied is whether, "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." Michigan v.Chesternut (1988), 486 U.S. 567, 573, citing United States v.Mendenhall (1980), 446 U.S. 544, 554.
 {¶ 20} Whether a seizure has escalated to an arrest depends upon the "existence of four requisite elements: (1) an intent to arrest, (2) under real or pretended authority, (3) accompanied by an actual or constructive seizure or detention of the person, and (4) which is so understood by the person arrested." State v.Barker (1978), 53 Ohio St.2d 135, paragraph one of the syllabus. "Mere words will not constitute an arrest, while, on the other hand, no actual, physical touching is essential. * * * There can be no arrest without either touching or submission." Hodari D.,499 U.S. at 626-627. This common law definition of arrest is applied for Miranda purposes, In re Travis (1996),110 Ohio App.3d 684, and speedy trial purposes. State v. Shilling (Dec. 30, 1996), 4th Dist. No. 96CA30.
 {¶ 21} When officers surrounded appellee's van with three unmarked cars, they intended to "pinch" his car and prevent any movement. The testimony indicates that the officers exited their vehicles with guns drawn to approach the van before appellee exited the van. The United States Supreme Court in Mendenhall
specifically listed these circumstances as indicative of a "seizure." Mendenhall, 446 U.S. at 554. Moreover, it is the type of "excessively intrusive" action Terry was intended to preclude.
 {¶ 22} Applying the test of whether an arrest was effectuated, a reasonable person driving slowly down their driveway, confronted with a car approaching head-on, a car blocking exit from the rear, and a car blocking from the side, with officers exiting those vehicles with drawn guns, would not feel free to leave. The trial court held that the officers' purpose in seizing appellee's vehicle was "not to conduct a brief investigatory stop but rather, for the sole and immediate purpose of arresting the defendant." Regardless of whether the surrounding facts and circumstances renders the act of hemming in and "pinching" appellee's van an "arrest" or a "seizure," the officers required probable cause. We find the state's argument — that the act of stopping appellee's van was an investigatory stop — without merit. The second assignment of error is therefore not well-taken.
 II. The Officers Lacked Probable Cause to Seize Appellee. {¶ 23} In its first assignment, the state argues it had probable cause to arrest appellee on May 10. Appellee responds that the state, having failed to raise this argument below, waived the issue on appeal. However, a review of the state's motion in opposition to appellee's motion to suppress revealed that the state did argue that officers had probable cause to seize and then search appellee.
 {¶ 24} Discussing the standard of probable cause, the state relies upon Illinois v. Gates (1983), 462 U.S. 213. Gates,
however, only pertains to probable cause required to issue a warrant to search or arrest. Here, the state does not dispute that appellee was arrested without a warrant, and that no warrant was obtained to search appellee's vehicle or residence.
 {¶ 25} "An arrest without a warrant is constitutionally invalid unless the arresting officer had probable cause to make it at that time. To have probable cause, the arresting officer must have sufficient information derived from a reasonably trustworthy source to warrant a prudent man in believing that a felony has been committed and that it has been committed by the accused." State v. Timson (1974), 38 Ohio St.2d 122, 127. "Thus, the existence of probable cause is a factual question.State v. Bernard (1985), 20 Ohio App.3d 375, 376." State v.Pavao (1987), 38 Ohio App.3d 178. Probable cause generally exists if an officer knows, at the moment of arrest, "facts and circumstances `sufficient to warrant a prudent man in believing that the [suspect] had committed or was committing an offense.'"State v. Tibbetts (2001), 92 Ohio St.3d 146, 153, quotingGerstein v. Pugh (1975), 420 U.S. 103, 111-112, quoting Beckv. Ohio (1964), 379 U.S. 89, 91. The "quantum of information" constituting probable cause for a warrantless arrest must be measured by the facts of each particular case. Wong Sun v. U.S.
(1963), 371 U.S. 471, 479. If officers possess facts and circumstances within their knowledge sufficient to constitute probable cause that a felony is being committed, then the warrantless arrest does not violate the Fourth Amendment. UnitedStates v. Watson (1976), 423 U.S. 411.
 {¶ 26} First, we discard the state's argument that appellee's attempt to flee contributes to probable cause. Because appellee was arrested or seized when the officers "pinched" appellee's van, preventing his movement and approaching the van with their guns drawn, appellee's subsequent attempt to flee is irrelevant to a determination of whether probable cause existed at the moment of his seizure.
 {¶ 27} The subjective intentions of the officers are irrelevant in a probable cause determination. Whether probable cause exists depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest. Devenpeck v. Alford (2004), 543 U.S. 146, 152, citingMaryland v. Pringle (2003), 540 U.S. 366, 371. Rather, a court must objectively view whether the facts and circumstances known to the arresting officer at the time of the arrest sufficiently establish probable cause. "[E]venhanded law enforcement is best achieved by the application of objective standards of conduct, rather than standards that depend upon the subjective state of mind of the officer." Id. at 153, quoting Horton v. California
(1990), 496 U.S. 128, 138.
 {¶ 28} The facts objectively known to the officers were as follows: (1) appellee had sold cocaine to a CI during a controlled buy eight days before his arrest; (2) officers observed appellee driving his van in the general area of Toledo in which the informants said appellee was delivering cocaine; (3) appellee had apparently, according to officers, participated in a sale of cocaine when he pulled into a Bob Evans parking lot and a man momentarily entered appellee's van; (4) appellee began to exit his mobile home park during the time period in which a CI had said a cocaine transaction was to take place.
 {¶ 29} We may easily discard the "apparent" drug transaction observed in the Bob Evans parking lot and the sight of appellee driving his van in the general area, as both activities are entirely commensurate with innocent activity. State v. Nelson
(1991), 72 Ohio App.3d 506, 508 (finding no probable cause to arrest for drug activities where officer only observed group standing on apartment stoop and movement of hands but observed no drug transactions). In neither instance did officers see appellee possess or transact in cocaine, and neither instance was corroborated by a CI's report of illegal activity. Neither instance gives rise to probable cause.
 {¶ 30} The events of March 10 also cannot, taken alone, create probable cause. These facts are, as the trial court noted, striking similar to those known to officers in State v. Young,
6th Dist. No. E-04-013, 2005-Ohio-3369. In Young, a drug task force officer received information from federal agents that the defendant had agreed to purchase cocaine from a federally indicted defendant. The federally indicted defendant set up a drug buy to take place in Cleveland, on a date certain. Id. at ¶¶ 3-4. Task force agents knew the specific vehicle the defendant would be driving from Erie County to Cleveland. Id. at ¶ 3. Agents watched the defendant's residence on the day set for the purchase; they observed a previously convicted drug dealer enter the defendant's residence and leave.
Id. at ¶ 4. The defendant's brother, who had previously done a "controlled buy" at the defendant's residence, also entered and left the residence. Id. When the defendant left his residence, he placed an unknown "something" in the trunk of a car, then drove east toward Cleveland. Id. at ¶ 5. At that point, officers stopped the car and arrested the defendant and his girlfriend. At the hearing, officers acknowledged that regardless of which car the defendant was driving, and regardless of other details of his behavior, they would have arrested the defendant when he left his home and traveled east toward Cleveland on the day of the "buy." Id. at ¶¶ 7-9.
 {¶ 31} Renz testified that she knew appellee was validly licensed when she initiated what she characterized as a "traffic stop" when appellee drove towards the mobile home park exit. She also testified that the CI only informed officers that appellee would make a delivery of cocaine "somewhere" on Lewis Avenue "sometime" between 6 and 7 p.m. She was the "lead" on the investigation, and she acknowledged that she told the other officers that "we have to attempt to make a traffic stop if possible prior to him getting to the location." However, all four testifying officers affirmed that appellee's vehicle committed no traffic violations.
 {¶ 32} Renz testified that their intention in stopping appellee's vehicle at that time was to catch appellee transporting drugs. Kyle Fulmer, a special agent at the FBI office in Toledo, acknowledged that their intention was not to allow the transaction to take place, and to stop appellee before the transaction. Kevin Wiezbenski, a vice narcotics detective with the Lucas County Sheriff's Department, testified that his role from the beginning of March 10 was "to go in front of Mr. Cabell as he was leaving the trailer park that he was residing in." He and a partner sat in an unmarked vehicle at the exit of the mobile home park, and were "simply out front waiting for those that did have an eye to let us know that a vehicle was leaving from there so that we could do our — what we were instructed to do." Later, he reiterated by saying, "Well, we had information that [appellee] would be going between 6 and 7 p.m., and at that time would be making a delivery of cocaine. At that point, we, [his partner] and I together, and we were instructed that when they would call out that he was leaving that we would cut him off." He agreed, on cross-examination, that "the purpose of cutting him off" was to "apprehend" appellant, even though he later characterized it as an "investigative stop."
 {¶ 33} Alexander Schaller, with the Toledo Police Department's metro drug task force, testified that he was informed that appellee would be leaving his mobile home sometime between 6 and 7 p.m. to deliver cocaine, and that they were to stop the vehicle as it left the mobile home park. He described the manner in which they stopped appellee: "[W]e tried to pinch it or stop the van by blocking it with our vehicles." He answered affirmatively the question, "Is it fair to say that on March 10, 2005, the decision was made to stop and apprehend Mr. Cabell when he left his mobile home?" As in Young, "there was no actual evidence of any criminal activity at the time of [appellee's] arrest which reasonably indicated that [appellee] was about to commit any criminal acts." 2005-Ohio-3369 at ¶ 23. "It is axiomatic that warrantless arrests must stand on firmer ground than mere suspicion." State v. Newell (1990),68 Ohio App.3d 623, 626, citing Wong Sun v. United States (1963),371 U.S. 471, 479.
 {¶ 34} Discarding the foregoing, only appellee's participation in the controlled buy of eight days prior to his arrest remains. The state argues that the "antecedent successful controlled buy" renders Young inapposite; that is, in contrast to Young, appellee's participation in the controlled buy of March 2 provides probable cause, regardless of whether the officers arrested appellee intending to charge him for the controlled buy. In response, appellee argues that, regardless of the officers' belief that appellee sold cocaine on March 2, they would "need independent evidence of criminal activity on the evening of March 10 in order to justify a warrantless arrest at that time." We find the state's argument unpersuasive.
 {¶ 35} The United States Supreme Court has rejected the "closely related offense" defense. Devenpeck, 543 U.S. at 154. That is, an officer's subjective reason for making an arrest need not correspond to the objective facts known to the officer constituting probable cause to arrest. Thus, an officer may possess probable cause to stop a motorist for an observed violation of traffic laws, and, due to events unfolding at the scene, the suspect may be arrested for charges unrelated to the original probable cause. This rule ostensibly prevents officers from the temptation of giving "every reason for which probable cause could conceivably exist" or from giving no reasons at all. Id. at 155. However, Devenpeck's rule was formulated in the context of an arresting officer articulating his subjective intent to arrest based on activity observed at the time of arrest, yet ultimately arresting and charging the suspect for an offense unrelated to the articulated probable cause. The rule was not formulated based upon an accused's suspected illegal activity of several days prior to his arrest.
 {¶ 36} The trial court relied heavily upon our statement inYoung that probable cause "generally focuses on the actions of the accused just prior to arrest." 2005-Ohio-3369, ¶ 20
(emphasis added). "[P]robable cause to stop is not the same as probable cause to search or arrest. Arrest focuses on the prior actions of the accused. * * * Factors to be considered include an officer's observation of some criminal behavior by the defendant, furtive or suspicious behavior, flight, events escalating reasonable suspicion into probable cause, association with criminal and locations. Katz, Ohio Arrest, Search and Seizure (2001 Ed.), 83-88, Sections. 3.12-3.19." State v. Crowley, 5th Dist. No. 04CA30, 2004-Ohio-5806, ¶ 10.
 {¶ 37} Although a Terry stop may be made to investigate a reasonable suspicion that an individual may have been involved in a completed felony, U.S. v. Hensley (1985), 469 U.S. 221, the United States Supreme Court has not ruled on whether probable cause to effect a warrantless arrest on the basis that a past crime has been committed may form the basis for an arrest for an unrelated crime that has not yet occurred. In Florida v. White
(1999), 526 U.S. 559, 565, footnote 4, the Court specifically stated, "We express no opinion about whether excessive delay prior to a seizure could render probable cause stale, and the seizure therefore unreasonable under the Fourth Amendment." It is elemental that the probable cause upon which a search warrant is issued may dissipate and become stale with the passage of time, although stale probable cause may be revived with fresh, corroborating information. "Because probable cause to search is concerned with facts relating to a presently existing condition * * * there arises the unique problem of whether the probable cause which once existed has grown stale. Whether information has grown stale must be determined on a case-by-case basis." U.S. v.Leaster (2002), 35 Fed.Appx. 402, 406, citing U.S. v. Spikes
(1998), 158 F.3d 913, 923. In contrast to probable cause to search, the probable cause to seize or arrest a person without a warrant must require a distinct and qualitatively different inquiry into the "presently existing condition" of the accused himself. Undoubtedly, officers may, upon reasonable suspicion that an individual was involved in an already completed felony, conduct an investigative stop; however, the rule was generated to promote the state's interest in prosecuting already completed crimes. U.S. v. Cortez (1981), 449 U.S. 411. Here, appellee's seizure requires probable cause — more than reasonable suspicion — that appellee was about to commit a crime, as the officers all acknowledged that they did not seize appellee intending to investigate the past alleged crime of the March 2 controlled buy.
 {¶ 38} Thus, appellee's actions of March 10 alone — merely attempting to exit his mobile home park during a one-hour time frame — do not satisfy the probable cause requirement. As inNelson and Newell, the officers acted prematurely, before observing further action by appellee indicative of criminal activity, such as appellee's traveling to a location of a drug transaction as specified by a CI. Moreover, although the state asserts its ongoing investigation revealed that the controlled buy of March 2 was indicative of a pattern of ongoing criminal activity, we have already stated that appellee's actions of randomly driving around, parking in restaurant parking lots, and talking briefly with others, does not indicate that appellee was acting suspiciously. Appellee's actions between March 2 and March 10 simply did not indicate "ongoing" criminal activity.
 {¶ 39} Since the officers unlawfully arrested appellee, then the search of his person incident to that arrest also violates the Fourth Amendment. A search incident to a lawful arrest is one exception to the general prohibition of warrantless searches.U.S. v. Robinson (1973), 414 U.S. 218; Chimel v. California
(1969), 395 U.S. 752. Since appellee's arrest was unlawful, the fruits of the search of his person must be excluded from evidence. State v. Nelson, supra.
 {¶ 40} The trial court did not confront whether appellee's girlfriend's consent for officers to search the mobile home was an "independent act of free will," valid regardless of the illegal seizure and arrest. An individual's voluntary consent, determined under the totality of the circumstances, may validate a search subsequent to an illegal detention if the consent is an "independent act of free will." Florida v. Royer (1983),460 U.S. at 501; Ohio v. Robinette (1996), 519 U.S. 33, 40; U.S.v. Lopez-Arias (2003), 344 F.3d 623, 629. Since the state did not make this argument below or on appeal, the issue is waived unless it rises to the level of "plain error." State v. Echols
(1998), 128 Ohio App.3d 677, 704; State v. Thymes, 9th Dist. No. 22480, 2005-Ohio-5505, ¶ 21; State v. Scott (2001),146 Ohio App.3d 233, 243. Moreover, the state has not raised the issue in its appellate briefs. Therefore, we affirm the trial court's suppression of all fruits of appellee's illegal seizure, including those items taken from his residence.
 {¶ 41} The judgment of the Lucas County Court of Common Pleas is affirmed. Appellant is ordered to pay the costs of this appeal pursuant to App.R. 24. Judgment for the clerk's expense incurred in preparation of the record, fees allowed by law, and the fee for filing the appeal is awarded to Lucas County.
JUDGMENT AFFIRMED.
A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. See, also, 6th Dist.Loc.App.R. 4.
Handwork, J. Singer, P.J. Skow, J. concur.