**NOT FOR PUBLICATION**
File Name: 06a0116n.06
Filed: February 14, 2006

**No. 05-5447**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

UNITED STATES OF AMERICA,

      Plaintiff-Appellant,

                                      ON APPEAL FROM THE
v.                                    UNITED STATES DISTRICT
                                      COURT FOR THE WESTERN
HONEY LYNN WOLFE,                DISTRICT OF KENTUCKY

      Defendant-Appellee.

_____/

**BEFORE:**    SUHRHEINRICH and GRIFFIN, Circuit Judges, and HOOD,* District Judge.

        **SUHRHEINRICH, J., Circuit Judge.**  The government appeals from an order of the district

court suppressing incriminating statements made by Defendant Honey Lynn Wolfe ("Wolfe" or

"Defendant") during a murder investigation of an infant on a U.S. Army base. The issue presented

is whether the taint from a temporary detention was sufficiently attenuated that Defendant's

subsequent incriminating statements are admissible in evidence. We hold that it was, and reverse

and remand for further proceedings.

**I. Background**

        Defendant, the wife of an American soldier stationed in Korea, was babysitting three-month-

old infant Braydon Grover on the morning of August 6, 2002, at her home on the U.S. Army base

at Fort Campbell, Kentucky. Braydon's mother was stationed at Fort Campbell. At approximately

---

        *The Honorable Joseph M. Hood, United States District Judge for the Eastern District of
Kentucky, sitting by designation.

10:30 a.m., Defendant called 911 to report that the child had stopped breathing. Paramedics were dispatched to the scene. They transported the child to the base hospital, where he was pronounced dead. At approximately 10:45 a.m., Military Policeman Sergeant Steven Wentzel arrived to investigate. According to Wentzel, Defendant told him that she had put the baby to sleep "at 0600 hours, and placed it face down, boxed in with blankets, because that's the way the baby likes to sleep." "She then said that she checked on the baby right before she called 911, because it wasn't breathing." "[S]he said at 0730 was the last time she heard the baby cry, because the baby would cry when it wasn't sleeping." Wentzel stated that Defendant told him that it normally took the baby about an hour to fall asleep and that "if it wasn't sleeping it was always crying." The military policemen secured the scene until agents from the Central Investigations Command ("CID") arrived.

CID Special Agent David Maier arrived at about 11:50 a.m. After being briefed by the military policemen, Maier asked Defendant if he could speak to her, and she agreed. She further agreed to go back to his office to discuss the matter. Maier stated that he did not tell Defendant that she had to go to the CID office. Maier did not read Defendant her *Miranda* rights at any point.

Military police escorted Defendant to the CID office, which is about five minutes away from her home. Defendant was placed in the interview suite. Defendant waited there approximately two hours. The interview began about 2:00 p.m. Maier did not read Defendant her *Miranda* rights, because in his view, "to that point there was nothing that led me to believe that she had committed any crime."

During the course of the interview, one of Maier's colleagues, Agent Shawn Burke, returned from the hospital with pictures of the baby, which had been taken at 11:56 a.m. The photographs showed lividity (pooled blood) on both the back and front of the baby. Maier felt that the

photographs raised "inconsistencies with the information that she had given me up until that point dealing with the time line and the way that she found the child and how that was inconsistent with the lividity found on the child." Maier decided to advise Defendant of her *Miranda* rights, utilizing a DA form 3881, military rights waiver. Defendant stated that she understood her rights and executed the waiver. The interview ended around 4:30 p.m.

FBI Special Agent Franklin Charles also interviewed Defendant. Charles asked Defendant if she would be willing to come back to the FBI office and take a polygraph examination, and Defendant assented. She further agreed to wait the three hours it would take for the polygraph examiner, FBI Special Agent Carl Christiansen, to arrive.

Charles' interview with Defendant ended at about 4:30 p.m. While waiting to be transported to the FBI office to take the polygraph examination, Defendant was kept in a locked holding area, which consisted of a room approximately seven feet by twenty feet with a bench. She was allowed to take smoking and bathroom breaks outside the room.

The FBI asked Maier to get a written statement from Defendant, which he took at approximately 6:40 p.m. Defendant's statement read: "I got drilled and questioned about what happened. Then they demanded a lie detector test. Now I'm writing–now I'm waiting on that. I have told the whole truth. No one believes me."

At approximately 7:30 p.m., a CID officer transported Defendant to the FBI office. Agent Charles, who was waiting for Defendant, introduced her to the polygraph examiner, Agent Christiansen. Christiansen testified that he made Defendant aware that she was not under arrest, and that "no matter what happened that evening she was not going to be arrested." Defendant signed

a consent form.[1] Christiansen also advised Defendant of her *Miranda* rights and she signed another form identifying those rights and waiving them, agreeing "to answer questions without a lawyer present." The questioning and advice prior to the commencement of the polygraph examination took approximately an hour and a half. The polygraph examination itself lasted approximately fifteen minutes. The room where the questioning and examination took place was locked from the outside, but anyone inside the room could get out.

After Christiansen analyzed the results of the polygraph examination, he concluded Defendant was lying about the day's events. Christiansen told Defendant that, in his opinion, she was not being truthful, and that he "wanted to talk to her about that and try to figure out why she didn't do well on the test." Christiansen then questioned her for several more hours. Christiansen said that Defendant changed her story a number of times during this period of questioning, but that she eventually told him that she may have wrapped the baby so tight in a blanket that it stopped breathing.[2] At this point, Christiansen called Agent Charles into the room. Christiansen asked

---

[1]The consent form explained: "You have the right to refuse to take the polygraph test. If you agree to take the polygraph test, you have the right to stop the test at any time. If you agree to take the polygraph test, you have the right to refuse to answer any individual questions." The consent form also contained the following acknowledgments: "I have read this statement of my rights and I understand what my rights are. I voluntarily agree to be examined by means of the polygraph during this interview. I understand what I am doing. No threats or promises have been used against me to obtain my consent to use the polygraph."

[2]The district court noted that in his notes, Christiansen recorded that Defendant agreed with him that she was in bed sleeping and that she snapped when the baby was crying and suffocated him. During the suppression hearing, however, Christiansen stated that Defendant volunteered the statement, rather than merely agreeing with his statement of the purported events. The court noted that Christiansen's choice of words in his notes was ambiguous, in that one could agree with a statement and also freely volunteer a statement. On the other hand, "the choice could have significance." The court also found that there was a credibility issue–namely between Christiansen's account that Defendant's denial that she made a confession at all.

Defendant to repeat to Charles what she allegedly had told to him. Defendant refused to say anything and the interview was terminated, at approximately 3:00 a.m.

On November 5, 2003, Defendant was indicted on one count of second-degree murder, in violation of 18 U.S.C. § 1111. Defendant moved to suppress all statements that she made to the investigators. The government opposed the motion, arguing that Defendant's "temporary detention" at the CID office "was supported by probable cause" and that "her statements to law enforcement authorities . . . should be admitted because they were entirely voluntary and consistent with her written waivers of her *Miranda* rights."

After holding an evidentiary hearing, the district court granted Defendant's motion to suppress. The court found that Defendant "voluntarily agreed to go" to the CID office and was not under arrest when she was transported to the CID. The district court further found that Defendant was placed in custody when her *Miranda* rights were read to her at about 2:25 p.m.

The district court held that the government did not have probable cause to arrest Defendant at that time. Specifically, the court determined that the photographs of the baby showing pooled blood on both the baby's front and back were "not sufficient to establish probable cause," because "they did not show that Ms. Wolfe had done anything wrong nor . . . lead to a reasonable conclusion that Ms. Wolfe's statements were inconsistent." The court held that the prosecution had not identified what statements made by Defendant led Maier to believe that she was not telling the truth, and, in fact, Maier had actually testified that Defendant "'continued to provide [him] the same time lines of her story for the duration of [his] portion of the interview.'" Thus, the district court ruled that the prosecution had not met its burden of showing that there were inconsistencies within Defendant's statements to justify Maier's finding of probable cause. The district court therefore

concluded that Defendant was the victim of an illegal arrest that lacked probable cause, and that, as a result, her subsequent statements must be suppressed.

Although it suppressed Defendant's statements, the district court also made a finding that they were voluntary under the Fifth Amendment. The court felt that the length of the interrogation, the location of the interrogation, and the continuity of the interrogation were all factors that weighed in favor of finding the alleged confession was involuntary, but that the totality of the circumstances, did not demonstrate that Ms. Wolfe was coerced into an alleged confession. "Ms. Wolfe was read her *Miranda* rights, she was not mistreated in anyway [sic], she had a high school degree with some college education, she was 31 years old and married, and there is no basis for finding that the officers used coercive techniques." The court granted the motion to suppress, however, "because Ms. Wolfe was arrested without probable cause."

The government moved for reconsideration, arguing that even if Defendant had been illegally arrested at the CID office, her statements at the FBI office were purged of any taint of that illegality because of intervening events and the passage of time, so that her subsequent statements to the FBI polygraph examiner should be admissible. The district court denied the government's motion for reconsideration. The district court stated in pertinent part:

> The Supreme Court found that police misconduct . . . does not have to include physical abuse or a confession that was involuntary under the Fifth Amendment. *Taylor v. Alabama*, 457 U.S. 687, 693 (1982). Instead, it is enough that an interrogation takes place "in the hope that something would turn up." *Id.* That is exactly what happened in this case. Ms. Wolfe was interrogated for hours by several different investigators hoping that they would get a "breakthrough." The Supreme Court also noted that a longer length of time does not make a significant impact as an intervening circumstance where as here the defendant was in polic[e] custody, unrepresented by counsel, and questioned on several occasions. *Id.* at 691. After 2:25 p.m., Ms. Wolfe was in continuous custody and was being transported by officers, locked in a cell, interrogated, or [sic] given a break upon her request. Ms. Wolfe was not represented by counsel. In contrast to the Government's assertion

that Ms. Wolfe should have felt she was free to go, when Ms. Wolfe was asked to make a statement, she stated that the officers had demanded that she take a polygraph. No intervening circumstances have purged the taint from Ms. Wolfe's illegal arrest.

The United States appeals both rulings.

## II. Analysis

### A. Standard of Review

This court reviews a district court's findings of fact in a suppression hearing for clear error and its conclusions of law de novo. *United States v. Lopez-Arias*, 344 F.3d 623, 627 (6th Cir. 2003).

### B. Merits

The government concedes that Defendant was unlawfully detained at the CID office when she was kept in a locked room for several hours while she waited to be transported to the FBI office to take the polygraph examination. The government further assumes for purposes of this appeal that there were insufficient grounds to detain her at that time. Notwithstanding, the government argues that Defendant's inculpatory statements were not causally related to her period of detention at the CID office. Specifically, the government maintains that even if Defendant was unlawfully detained when she was held in a locked room at the CID office, the admissions she made at the FBI office approximately six hours later, after she failed the polygraph examination, were not the fruit of that unlawful detention. The government claims that the mild nature of the detention and its benign purpose, as well as the events intervening between that detention and Defendant's admissions, establish that her admissions were sufficient acts of free will to purge the taint of any unlawful detention. *See Brown v. Illinois*, 422 U.S. 590, 602 (1975).

An illegal detention or arrest does not render all subsequently discovered evidence inadmissible per se. *Wong Sun v. United States*, 371 U.S. 471 (1963). Rather, the question is "whether, granting establishment of the primary illegality, the evidence . . . has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *Id.* at 488 (quotation omitted). Thus, a confession obtained through custodial interrogation following an illegal arrest in violation of the Fourth Amendment must be excluded from evidence unless the confession was "'sufficiently an act of free will to purge the primary taint.'" *Brown*, 422 U.S. at 602 (quoting *Wong Sun*, 371 U.S. at 486).

The threshold requirement for admissibility under *Brown* is that the confession must have been voluntary for purposes of the Fifth Amendment. *Id.* at 601-02. The *Brown* Court also articulated a number of factors that a court should take into account in determining the admissibility of a confession following a custodial arrest:

> The Miranda warnings are an important factor, to be sure, in determining whether the confession is obtained by exploitation of an illegal arrest. But they are not the only factors to be considered. The temporal proximity of the arrest and the confession, the presence of intervening circumstances, and, particularly, the purpose and flagrancy of the official misconduct are all relevant.

*Brown*, 422 U.S. at 603-04 (internal citations omitted). The government has the burden of proving the admissibility of a confession following an illegal arrest. *Kaupp v. Texas*, 538 U.S. 626, 633 (2003) (per curiam)

### 1. Voluntariness

As noted, the threshold issue for admission under *Brown* is that the confession must have been voluntary for purposes of the Fifth Amendment. *Brown*, 422 U.S. at 602; *accord United States v. Reed,* 349 F.3d 457, 463 (7th Cir. 2003). The district court found that Defendant's incriminatory

statements at the FBI office were voluntary under Fifth Amendment principles. As noted above, the court ruled that the totality of the circumstances did not demonstrate that Defendant was coerced into an alleged confession because she received her *Miranda* warnings, was not mistreated or subjected to coercive tactics, and has a high school education. Defendant does not contest this ruling. Thus, this factor supports the admission of Defendant's alleged confession.

With this in mind, we turn to the other *Brown* factors.

## 2. Temporal Proximity

Before discussing the second *Brown* factor, we must consider the government's argument concerning the establishment of the primary illegality, namely that Defendant was not in custody until around 4:30 p.m., when she was placed in the locked holding cell, and not at 2:30 p.m., after she was shown the photographs and read her *Miranda* rights, as the district court held.

### a. In Custody

First, the government challenges the district court's ruling that Defendant was "in custody by the time Agent Maier gave her the *Miranda* warnings at 2:25 p.m." The government contends that Defendant was not detained prior to being confined in the locked holding area at the CID office.

While it is true that *Miranda* warnings are required when "a suspect's freedom of action is curtailed to a 'degree associated with a formal arrest,'" *Berkemer v. McCarty*, 468 U.S. 420, 440 (1984) (quoting *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (per curiam)), the mere reading of *Miranda* warnings does not convert a noncustodial interview into a custodial interrogation, *United States v. Lewis*, 556 F.2d 446, 449 (6th Cir. 1977) (per curiam) ("The precaution of giving *Miranda* rights in what is thought could be a non-custodial interview should not be deterred by

interpreting the giving of such rights as a restraint on the suspect, converting a non-custodial interview into a custodial interrogation for *Miranda* purposes.").

The district court's ruling that Defendant was in custody at the CID office when she was read her *Miranda* rights at approximately 2:25 p.m. was based on the view that custody resulted from Maier's act of giving those warnings and Maier's subjective belief that he had probable cause to arrest her. This ruling is contrary to both *Lewis* and *Berkemer.* *See Berkemer*, 468 U.S. at 442 (officer's subjective intention "has no bearing on the question whether a suspect is 'in custody'").[3] Also, the fact Maier confronted Defendant with the photographs and indicated that he thought she was lying also does not, without more, transform the encounter into a custodial interrogation. *Cf. Oregon v. Mathiason*, 429 U.S. 492, 495-96 (1977) (per curiam) (stating that an officer's false statement about having discovered the suspect's fingerprints at the scene had "nothing to do with whether respondent was in custody for purposes of the Miranda rule").

Further, nothing in the record suggests that a reasonable person in Defendant's position would believe that he or she was being detained or compelled to answer Maier's questions. Rather, the record shows that Maier's interview with Defendant, even after Maier gave her the *Miranda* warnings, was "a calm exchange between two people trying to ascertain what had happened." *Cf. United States v. Drayton*, 536 U.S. 194, 204 (2002) (holding that an encounter was consensual,

---

[3]Defendant contends that *Lewis* is distinguishable because the suspect in that case came by himself to the interview, was given his *Miranda* warnings prior to any discussion, and no new information was presented during the questioning. *See Lewis*, 556 F.2d at 447. Here, by contrast, Defendant was taken to the CID office in her pajamas and questioned for some time before Maier read Defendant her *Miranda* warnings and confronted her with the pictures of the dead child. Defendant's argument must be rejected. Most importantly, the district court found as a matter of fact that Defendant voluntarily accompanied the officers to the CID office. Thus, the fact that she did not drive herself is immaterial.

despite the suspect's subjective belief that he must cooperate, because the officers did nothing that objectively made the encounter coercive: "no application of force, no intimidating movement, no overwhelming show of force, no brandishing of weapons, no blocking of exits, no threat, no command, not even an authoritative tone of voice").

### b. Temporal Relationship

*Brown* also directs courts to consider the temporal proximity of the arrest and the confession. *Brown*, 422 U.S. at 603. However, "there is no 'bright-line' test for temporal proximity." *United States v. Reed*, 349 F.3d 457, 463 (7th Cir. 2003) (citations omitted). Here, the time between the initiation of the illegal detention and the alleged confession was almost ten hours. Although longer than the period of time in *Brown*, *see Brown*, 422 U.S. at 604-05 (less than two hour interval between illegal arrest and first statement with no intervening event "of significance whatsoever" not sufficient to cure taint), and *Dunaway*, *see Dunaway v. New York*, 442 U.S. 200, 218 (1979) (two hour interval with no intervening event of significance; holding that taint was not cured), the time frame here is still within the ambit of that in *Taylor, see Taylor v. Alabama*, 457 U.S. 687, 691 (1982) (holding that six hour length of time between illegal arrest and confession was not a significant amount of time to break the connection between the illegal arrest and the petitioner's confession where the petitioner was in police custody, without counsel, was questioned on several occasions, fingerprinted, and subjected to a lineup). We therefore consider the temporal proximity factor in conjunction with any intervening circumstances. *See Reed*, 349 F.3d at 464.

### 3. Intervening Circumstances

Next, *Brown* directs courts to consider whether any circumstances intervened between the initial detention and the challenged statements. As noted, the Supreme Court has observed that the

-11-

mere giving of *Miranda* warnings does not sufficiently break the connection between the illegal detention and the confession or search. *Taylor,* 457 U.S. at 691 (holding that three *Miranda* warnings did not sufficiently purge the taint of the illegal arrest). Instead, there must be present intervening events that sever the causal connection between the illegal arrest or search and the discovery of the incriminating evidence. *See, e.g., Rawlings v. Kentucky*, 448 U.S. 98,108-09 (1980) (discovery of other incriminating evidence was attenuating circumstance); *Wong Sun*, 371 U.S. at 491 (holding that confession made several days after illegal arrest and preceded by arraignment and release from custody was admissible); *cf. Reed,* 349 F.3d at 464 (holding that non-confrontational interviews between the defendant and police, and the defendant's periods of solitary reflection combined with fact that confession occurred within six hours of illegal arrest was not sufficient to sever the connection).

The government claims that there are two intervening events of significance. First, it claims that Defendant's unlawful detention ended when she arrived at the FBI office and was told by Christiansen that she was not under arrest, that she was free to leave at any time, and that she would not be arrested in any event. Second, the government claims that Defendant's admissions were the result of being told that she failed the polygraph examination, which she voluntarily agreed to take, and not the result of her detention at the CID office.

The district court did not address the events at the FBI office, but simply held that Defendant was in continuous custody after 2:25 p.m. Defendant, for her part, states that she did not consent to take a polygraph, pointing to her handwritten statement that the officers "demanded" a polygraph. Nonetheless, Defendant did sign a "Consent to Interview With Polygraph" form, which explicitly provided that: "I voluntarily agree to be examined by means of the polygraph. . . . No threats or

promises have been used against me to obtain my consent." Furthermore, and most importantly, as the district court found, Defendant agreed to take the polygraph examination and further agreed to wait three hours for the polygraph examiner to arrive. We hold that these voluntary decisions by Defendant –to take the polygraph examination (both times), and to wait three hours for the polygraph examiner–were acts of free will sufficient to purge the taint of the illegal arrest.

The government cites as the second intervening circumstance the polygraph examination, or more precisely, Defendant's reaction to the results of the polygraph examination. It is apparent that Defendant's allegedly incriminatory admissions were triggered by the information that she failed the polygraph examination, and not by the fact that she was illegally detained for three hours while voluntarily waiting for the polygraph examiner nearly ten hours earlier. She maintained her exculpatory explanation throughout the day to each of the officers who questioned her, including Christiansen. Defendant only allegedly began to change her story after Christiansen told her she had failed the polygraph examination. Furthermore, she had no difficulty ending the interview at 3:00 a.m. In short, as the district court found this was not a situation were "a defendant's will [had] been overcome and a false confession obtained."

In sum, we conclude that Defendant's consent to take the polygraph examination, both at 4:30 p.m. and again when she signed the consent form, and her agreement to wait three hours for the examiner, were "intervening independent act[s] of free will to purge the primary taint" of the illegal detention. The district court erred in concluding otherwise.

### 4. Purpose and Flagrancy of Police Misconduct

Fourth, *Brown* requires consideration of the purpose and flagrancy of the official misconduct. *Brown*, 422 U.S. at 604. This factor is considered "particularly" important, *see Brown*, 422 U.S. at

604; *United States v. Fazio*, 914 F.2d 950, 958 (7th Cir. 1990) (citing *Brown*), because it is linked directly to the rationale underlying the exclusionary rule–deterrence of police misconduct, *Reed*, 349 F.3d at 465 (citing *Brown*, 422 U.S. at 600); *Reed*, 349 F.3d at 464-65; *Fazio*, 914 F.2d at 958. Relevant considerations include whether "the arrest, both in design and in execution, was investigatory," *Brown*, 422 U.S. at 605, and also whether the arrest was calculated "to cause surprise, fright, and confusion," *id.*

This factor weighs against suppression. Defendant was not questioned during the period she was illegally detained, and she was not questioned at the FBI office until after she was again advised that she was not under arrest. *Cf. Taylor*, 457 U.S. at 691 (finding purposeful misconduct because in a six-hour period between the illegal arrest and confession, the petitioner was unrepresented by counsel, questioned on several occasions, fingerprinted, and subjected to a lineup). The conditions of Defendant's detention in the locked holding area at the CID office were mild. She was never placed under arrest, handcuffed, or even placed in a traditional cell. It is clear that the purpose of this detention was merely to await the arrival of the polygraph examiner at the FBI office, and Defendant had already agreed to undergo a polygraph examination. Thus, the police misconduct in this case was not flagrant or purposeful in the sense that the officers used the period of the illegal detention to procure a confession.

This was not a situation where the defendant was unlawfully detained for interrogation in the hope that something would "turn up." *See Kaupp,* 538 U.S. at 628-33 (officers removed the petitioner from his home in the middle of the night without any probable cause); *Taylor*, 457 U.S. at 693 (finding flagrancy in the fact that police effectuated an investigatory arrest without probable cause, based on an uncorroborated informant's tip, and involuntarily transported the defendant to

the police station for interrogation in the hope that "something would turn up"); *Dunaway*, 457 U.S. at 218 (holding that the petitioner was seized without probable cause based only on a tip from a jail inmate that admittedly did not supply enough information to obtain a warrant, brought to police headquarters and placed in an interrogation room where he was questioned "in the hope that something might turn up," and confessed without any intervening circumstances); *Brown*, 422 U.S. at 605 (finding that the illegality had a quality of purposefulness, that the impropriety of the arrest was obvious from the detectives' concession that the arrest was investigatory; officers admitted lack of any probable cause to arrest, let alone remove suspect from his residence); *cf. Lopez-Arias*, 344 F.3d at 630 (finding that illegality of the arrest was "blatant," and cases discussed therein). Defendant was the only eye witness to the alleged crime, and was therefore naturally a suspect. She volunteered at the outset that the baby had been crying. Even at that, as the district court found, initially the officers did not detain her in any way, and she voluntarily agreed to go to the CID office to make a statement. She was seated in the waiting room until Maier arrived at the CID office.

Most importantly, Defendant was not questioned during the three-hour period when she waited for the polygraph examiner to arrive. Under these circumstances, it cannot be said that the illegal detention was an attempt to obtain evidence by "exploitation." *See Fazio*, 914 F.2d at 958. "Because the primary purpose of the exclusionary rule is to discourage police misconduct, application of the rule does not serve this deterrent function when the police action, although erroneous, was not undertaken in an effort to benefit the police at the expense of the suspect's protected rights." *Id.* As in *Rawlings*, "the conduct of the police here does not rise to the level of conscious or flagrant misconduct requiring prophylactic exclusion of petitioner's statements." *Rawlings*, 448 U.S. at 110.

Defendant's illegal detention lacks the "quality of purposefulness" condemned in *Brown*.

*See Brown*, 422 U.S. at 605. Nor do the circumstances indicate that the manner of Defendant's

detention was "calculated to cause surprise, fright, or confusion." *Id.* In short, this factor, the "most

important" factor, *Reed*, 349 F.3d at 464, reinforces the conclusion that Defendant's alleged

statements[4] were the act of free will and not the product of an illegal detention.

### III. Conclusion

For the foregoing reasons, this matter is **REVERSED** and **REMANDED** for further

proceedings consistent with this opinion.

---

[4]As the district court observed, there is a credibility issue on this point that can be presented to the finder of fact.