ROGERS, J., delivered the opinion of the court, in which HOOD, D.J., joined. MOORE, J. (pp. 991-97), delivered a separate dissenting opinion.
OPINION
ROGERS, Circuit Judge.
As a result of a presumably illegal airport search, the Government learned that Fode Fofana used “Ousmane Diallo” as an alias. Identification bearing Diallo’s name was previously used to open two bank accounts, through which Fofana allegedly committed bank fraud. In Fofana’s federal bank fraud case, the district court suppressed any evidence bearing Diallo’s name, and the Government appeals that order. Although the actual documentation seized during the search must be suppressed, evidence obtained legally and independently of the search is not suppressible, even if the Government cannot show that it would have discovered its significance without the illegal search. Under the facts of this case, the minimal deterrent effect of suppression is far outweighed by the sweeping burden on the truth-seeking function of the courts.
I.
On November 29, 2007, two U.S. Bank checking accounts were opened in Cincinnati, Ohio, in the name of Ousmane Diallo. The man produced a passport from Guinea bearing the name Ousmane Diallo for the purpose of opening the accounts, and a photocopy of the passport was added to the record. On February 15, 2008, the IRS directly deposited $3,787 into one of the checking accounts. Diallo withdrew $2,500 from that account before U.S. Bank discovered that the money was a tax return belonging to an individual named Allison Miller. The account was blocked, a police report filed, and U.S. Bank notified the IRS. On December 12, 2008, the IRS made two direct deposits to one of the checking accounts. Those deposits were tax returns belonging to an individual named Christopher Marks. Diallo attempted to make a large cash withdrawal from one of the checking accounts on January 31, 2009, but the transaction was not processed due to the block. The Government alleges that at this point, the Secret Service had already begun an investigation of the accounts.
*987 Later in the day on January 31, 2009, Fofana arrived at the Port Columbus International Airport. His boarding pass was flagged to identify him as a “Selectee” for additional screening. After Fofana presented a valid state driver’s license in the name of Fode Fofana at the security checkpoint, the screening agent informed Fofana that he would need to undergo additional screening. During the search of Fofana’s personal items, a TSA agent found various envelopes containing large amounts of cash. The TSA agent then found two unsealed envelopes that “contained something hard and unbendable,” but unidentifiable. The TSA agent opened the envelopes and found three passports bearing Fofana’s picture but different names. One of the passports contained Fofana’s picture and the name Ousmane Diallo.
Upon discovering the passports, the TSA agent contacted law enforcement officers, who subsequently arrested Fofana. The information found pursuant to the search was conveyed to U.S. Bank, and U.S. Bank filed a Suspicious Activity Report (SAR) on February 18, 2009. The bank concluded in the SAR that “the Guinea Passport belonging to Ousmane Diallo was fraudulent” and the actual individual was Fofana.
Fofana was indicted on three counts of possession of a false passport in violation of 18 U.S.C. § 1546(a) as well as two counts of bank fraud in violation of 18 U.S.C. §§ 1344 and 1028A(a)(l). Fofana filed a motion to suppress “all evidence obtained as the result of the unlawful search and seizure of his persons and belongings” at the airport. The district court granted Fofana’s motion, finding that the Government failed to meet its burden of establishing that the search was constitutional. The district court concluded that “the extent of the search went beyond the permissible purpose of detecting weapons and explosives and was instead motivated by a desire to uncover contraband evidencing ordinary criminal wrongdoing.” The district court stated that “[a]ny evidence that was seized or subsequently obtained as a result of Fofana’s unlawful search, including, the three passports, will be suppressed.” The Government consequently moved to voluntarily dismiss the three counts relating to possession of a false passport.
Fofana then filed a motion in limine “to bar introduction of U.S. Bank account records in the name of Ousmane Diallo, U.S. Bank surveillance videos, and photos of Ousmane Diallo and IRS payment records for Ousmane Diallo’s U.S. Bank accounts as fruits of the unlawful search.” The district court granted Fofana’s motion, concluding that “the Government has not alleged sufficient facts to meet [the] burden of proof to show that the connection of Fofana to his alias would have been made through an independent source or through inevitable discovery.” The district court further concluded that the identity exception to the exclusionary rule did not apply because “Fofana is not challenging the presence of his body or identity, but rather evidence of an alias.” It is this grant of the motion in limine that the Government timely appeals.
II.
There is a difference between evidence that the Government obtains because of knowledge illegally acquired, and evidence properly in the Government’s possession that it learns the relevance of because of knowledge illegally acquired. It may be that the latter must be suppressed in some cases. But in the context of the present case, bank records and other evidence that the Government obtained independently of the airport search do not *988 have to be suppressed on account of the unconstitutionality of that search, merely because the relevance or usefulness of that evidence became apparent because of the search.
The reasoning behind this conclusion is strongly supported by case law, although the precise combination of circumstances appears to be unprecedented. First, the actual documents whose suppression is at issue — the bank records reflecting the fraud — were in the possession of the Government entirely free of illegal means. Secondly, the illegal search was not directed to the crime, or even the type of crime, for which the discovered information turned out to be useful, thereby eliminating much of the deterrent effect of suppression in this case. Third, an alternate, more direct deterrent to such searches is clearly present, in the form of excluding the passports from evidence. Fourth, exclusion of the bank records in this case unduly burdens the truth-seeking function of courts by effectively precluding relevant and legitimately obtained evidence from ever being used.
First, the bank records at issue were in the Government’s possession entirely free of illegal taint. Indeed, they were largely if not entirely in the Government’s possession before the illegal search, and included at least one photograph of Fofana that could link him to the U.S. Bank account once his identity was known. “[T]he government cannot be made worse off because of misconduct than it would have been if the misconduct had not occurred.” United States v. Alexander, 540 F.3d 494, 503 (6th Cir.2008) (citing Nix v. Williams, 467 U.S. 431, 443-44, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984)). To the extent that any of the records at issue were obtained by the Government after the airport search, our analysis extends only to those records clearly related to the crime regardless of the Government’s knowledge of Diallo’s identity. Our holding does not extend beyond such records and those in the Government’s possession prior to the search.
The importance of the fact that the evidence was properly in the Government’s possession is supported by the holdings of the Supreme Court that voluntary testimony of witnesses is admissible even though information from an illegal search led to the witness’s testimony. In United States v. Crews, 445 U.S. 463, 100 S.Ct. 1244, 63 L.Ed.2d 537 (1980), the Supreme Court upheld the admissibility of a victim’s in-court identification of the defendant even though a photo of the defendant used in a preliminary photo lineup had been unconstitutionally obtained. As the plurality reasoned, “the Fourth Amendment violation ... yielded nothing of evidentiary value that the police did not already have in their grasp.” Id. at 475, 100 S.Ct. 1244. Similarly, in United States v. Ceccolini, 435 U.S. 268, 98 S.Ct. 1054, 55 L.Ed.2d 268 (1978), the Supreme Court upheld the admission of a flower shop employee’s testimony impeaching that of a gambling scheme operator accused of perjury where the police learned of the flower shop employee’s knowledge as a result of an inquiry following an illegal search of an open drawer in the shop. The Supreme Court emphasized the degree to which the flower shop employee was willing to testify freely, because “[t]he greater the willingness of the witness to freely testify, the greater the likelihood that he or she will be discovered by legal means and, concomitantly, the smaller the incentive to conduct an illegal search to discover the witness.” Id. at 276, 98 S.Ct. 1054. The Court reasoned that “the illegality which led to the discovery of the witness very often will not play any meaningful part in the witness’ willingness to testify.” Id. at 277, 98 S.Ct. *989 1054. The underlying idea is that a voluntary witness’s testimony is independent because it is freely available to be found and used without the necessity of the illegal search.
The same can perforce be said in the present case because the records were not only freely available, but actually were in the possession of the Government independent of the illegal search. It is only incidental that an illegal search speeded the recognition of the usefulness of the available evidence, or in other words narrowed the investigation. That aspect of Ceccolini is just like this case. Ceccolini is not distinguishable because of the Supreme Court’s focus on the voluntariness of the testimony. The voluntariness of the testimony shows the free availability of the evidence; such a showing is entirely unnecessary where the evidence is not only available but independently possessed. In Crews, the Supreme Court explained that “the victim’s capacity to identify her assailant in court neither resulted from nor was biased by the unlawful police conduct committed long after she had developed that capacity.” Crews, 445 U.S. at 473, 100 S.Ct. 1244. In this case, if the evidence in the Government’s possession obtained before or independently of the search has the capacity to identify Fofana as Diallo, that capacity is wholly separate from the unlawful conduct that first made the police aware of the potential link.
Second, the focus of the airport search was in no way related to the usefulness to the bank fraud prosecution of the information obtained. The deterrent effect of excluding the evidence is therefore minimal. The Supreme Court so reasoned in Ceccolini. In that case, there was
not the slightest evidence to suggest that [the policeman] entered the shop or picked up the envelope with the intent of finding tangible evidence bearing on an illicit gambling operation, much less any suggestion that he entered the shop and searched with the intent of finding a willing and knowledgeable witness to testify against respondent. Application of the exclusionary rule in this situation could not have the slightest deterrent effect on the behavior of an officer such as [this policeman].
Id. at 279-80, 98 S.Ct. 1054. In United States v. Abridge, 346 F.3d 618, 628 (6th Cir.2003), we noted that the fact that the officer in Ceccolini was “not specifically in search of the particular evidence sought to be suppressed” weighed against suppression when considering the purpose of the misconduct at issue. In this case, the TSA agent admitted to looking for contraband. The passports found may be considered such contraband, but what Fofana is moving to suppress is not the passports, but rather the link between him and his alias. That evidence is quite remote from what could reasonably have been expected to result from the search. Suppressing it would have a minimal deterrent effect in the future.
Third, and relatedly, there is a far more direct and effective way to deter illegal searches like the one in this case. The tangible evidence actually found cannot be admitted. In this case the Government was not permitted to use the passports as evidence, and the Government does not challenge this on appeal. Similarly, in Crews the Government could not use the photo lineup as evidence against the defendant, and in Ceccolini the Government could not use the gambling slips that the policeman wrongly examined. The deterrent effect that results from these suppressions renders minor any additional deterrence from suppression of the testimony, or, in this case, the link between Fofana and Diallo. The deterrent effect of the exclusion of the passports here is *990 particularly powerful since it effectively eliminates the possibility of convicting Fofana of the first three counts of his indictment. Other circuits have held that the exclusionary rule did not apply when a second, more remote set of charges was brought on the same evidence illegally obtained, since the deterrent effect was achieved by suppressing the evidence on the initial charges. See United States v. Awadallah, 349 F.3d 42 (2d Cir.2003); United States v. Varela, 968 F.2d 259 (2d Cir.1992); United States v. Paepke, 550 F.2d 385 (7th Cir.1977). The Supreme Court has held that “the benefits of deterrence must outweigh the costs. We have never suggested that the exclusionary rule must apply in every circumstance in which it might provide marginal deterrence.” Herring v. United States, 555 U.S. 135, 141, 129 S.Ct. 695, 172 L.Ed.2d 496 (2009) (internal citations and quotation marks omitted). The suppression of the passports achieves a significant deterrent effect; any marginally increased effect from further suppression cannot be justified when one considers the substantial costs of such an action.
Fourth, exclusion of the bank records in this case would burden the truth-seeking function of the courts in a way closely analogous to the concern expressed by the Supreme Court in Ceccolini. See 435 U.S. at 277-78, 98 S.Ct. 1054. Once the Government learns who Diallo really is, how is the Government to identify him free of the taint of the underlying knowledge? No matter how investigators finally identify Diallo, the Government will be accused of having used its ill-gotten knowledge in narrowing the investigation. And requiring the police to follow a lot of known false leads appears an undue cost of the exclusionary rule. A more reasonable cost is that the police must find new or different untainted evidence, as they have in this case.
As an example, suppose a girl’s body, hidden in a house by a depraved kidnapper, is noticed by an officer conducting an unconstitutional narcotics search. Let us say the officer is relying on a warrant based on a barebones affidavit. How can the police proceed without risking immunizing the kidnapper from prosecution? Do they have to ignore the information by assigning the kidnapping investigation to officers who are unaware of the discovery, thereby continuing an expensive city-wide manhunt? Or by focusing their investigation on the house in question, do they risk the exclusion of any evidence they find as a result of such a focused but otherwise constitutionally conducted investigation? The exclusionary rule cannot force such a Hobson’s choice. Instead, the police must proceed by constitutional means to get admissible evidence, but without putting valuable information out of their heads. This approach more properly balances the deterrent rationale of the exclusionary rule with the truth-seeking function of the courts.
In Ceccolini, the Supreme Court relied on a similar concern, reasoning that exclusion of live testimony of witnesses “would perpetually disable a witness from testifying about relevant and material facts, regardless of how unrelated such testimony might be to the purpose of the originally illegal search or the evidence discovered thereby.” 435 U.S. at 277, 98 S.Ct. 1054. In this case, upholding suppression would just as perpetually keep the very evidence of the bank fraud — the bank records of the fraud — from being presented to the criminal fact finder. The Supreme Court has repeated that “when balancing the interests involved, we must weigh the strong interest under any system of justice of making available to the trier of fact all concededly relevant and trustworthy evidence which either party seeks to adduce.” *991 Id. at 278, 98 S.Ct. 1054 (quoting Michigan v. Tucker, 417 U.S. 433, 450, 94 S.Ct. 2357, 41 L.Ed.2d 182 (1974)). Balancing this interest against the comparatively weak Fourth Amendment interests in this case compels the conclusion that the bank records be admitted.
The Eight Circuit reasoned similarly when it encountered a situation similar to the one before us. In United States v. Watson, 950 F.2d 505 (8th Cir.1991), police wrote down banking information during a search for marijuana and illegal weapons, and subsequently began to investigate Watson’s financial activities. The only information used from the search was Watson’s alias and the names of some banks. The coxirt presumed that the records search was illegal, but nevertheless held that the evidence subsequently obtained was sufficiently attenuated to purge it of possible taint. “The mere fact that information gained during at illegal search gives rise to a subsequent, separate investigation of an individual does not necessarily taint the later investigation .... Furthermore, if the information merely facilitates or shortens the subsequent investigation, it does not taint the investigation’s results.” Id. at 507-08. To find otherwise “would amount to granting the suspect ‘life-long immunity from investigation and prosecution.’ In such situations, the societal cost of imposing the exclusionary rule outweighs any deterrent effect.” Id. at 508 (quoting United States v. Friedland, 441 F.2d 855, 861 (2d Cir.1971)).
Finally, our holding is consistent with our decision in United States v. Leake, 95 F.3d 409 (6th Cir.1996). In that case, police learned as a result of an illegal search that Leake went by the alias John Sandusky and that he was involved in a marijuana trafficking conspiracy. Prior to the search, the police had acquired no evidence linking even Sandusky, Leake’s alias, to the conspiracy. Further, at the suppression hearing, the Government did not produce any evidence linking Leake to Sandusky not the result of the search. We refused to give the Government a second chance, two years later, to provide such evidence, in a case “brimming with loose ends.” Id. at 418 n. 18.
III.
We reverse the judgment of the district court and remand for proceedings consistent with this opinion.