NOT RECOMMENDED FOR PUBLICATION
File Name: 12a0808n.06

No. 11-1331

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

|  |  |  |
|---|---|---|
| UNITED STATES of AMERICA, | ) | **FILED** |
|  | ) | ***Jul 26, 2012*** |
| Plaintiff-Appellant, | ) | LEONARD GREEN, Clerk |
|  | ) |  |
| v. | ) | ON APPEAL FROM THE UNITED |
|  | ) | STATES DISTRICT COURT FOR THE |
| CHARLES EARL WATSON, | ) | EASTERN DISTRICT OF MICHIGAN |
|  | ) |  |
| Defendant-Appellee. | ) |  |
|  | ) | OPINION |

Before:  GIBBONS, GRIFFIN, and DONALD, Circuit Judges.

DONALD, Circuit Judge.  Defendant-Appellee Charles Earl Watson was charged in the Eastern District of Michigan with (1) possession with intent to distribute 50 grams or more of cocaine base, in violation of 21 U.S.C. § 841(a)(1); (2) possession with intent to distribute marijuana, in violation of 21 U.S.C. § 841(a)(1); (3) possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A); and (4) possession of a firearm by a felon, in violation of 18 U.S.C. § 922(g)(1). The district court granted Watson's motion to suppress evidence found on Watson's person and his post-arrest statements. The government appeals the district court's order granting Watson's motion to suppress his post-arrest statements.  For the following reasons, we affirm.

I.

At about 4:25 p.m. on April 20, 2010, Deputy Anthony Shepard and Sergeant Tommy Schuette of the Jackson County Sheriff's Department, with the assistance of a confidential informant ("C.I."), executed a controlled purchase of crack cocaine in Jackson, Michigan. The C.I. arranged the purchase with a man named Lewis and instructed Lewis to meet him at Lewis's home at 808 Second Street ("the home"). Lewis and a female companion arrived at the home in a red Ford Expedition and went inside with the C.I., who paid for the drugs with two $20 bills with pre-recorded serial numbers.

After the controlled purchase took place, the C.I. informed the officers that there was an unnamed man visiting from Detroit in the home and that this man showed him an Arizona Iced Tea can with a false bottom containing narcotics in the freezer of the home. Sergeant Schuette relayed this information to Deputy Mark Easter, who was in the area in a marked car. Easter was directed to go to the Sheriff's Office and prepare a search warrant for the home.

While awaiting the search warrant, the officers observed Lewis and his female companion exit the home and drive off in the red Ford Expedition. Deputy Easter was instructed to perform a traffic stop of the Expedition in the hope of securing any evidence in the couple's possession. Easter conducted the stop about three or four blocks from the home. The driver of the Expedition was identified as Lewis Timothy Earnest, and the woman was identified as Teresa Ann Adams. Earnest confirmed to Easter that there was a man visiting from Detroit inside the home. During an inventory

search of the vehicle, Easter discovered one of the pre-recorded $20 bills used in the controlled buy. After the traffic stop, Deputy Easter returned to the station to prepare a search warrant for the home.

Deputy Shepard testified that he and Sergeant Schuette had previously worked in the neighborhood and had determined that it was a high drug activity area. Shepard also testified that it was customary for people in the neighborhood to alert each other to a traffic stop of one of their neighbors. Believing that someone would alert the unknown man from Detroit to the traffic stop of Lewis, Shepard and Schuette decided to secure evidence they thought was in the home, even though they had not yet obtained the search warrant. The officers called for backup, and Shepard went to the front door of the house while Schuette went to the back door. Officer Thomas Tinklepaugh of the Jackson City Police arrived at the scene in full uniform and in a marked car. He joined Shepard at the front door of the house. Shepard noticed that the front door was open but the screen door was closed. He testified that he smelled raw marijuana and saw a man, later identified as Watson, inside the home. Shepard opened the screen door, entered the home with his gun drawn and instructed Watson to get on the floor. Shepard then holstered his gun and performed a leg sweep to take Watson to the ground. Officers searched Watson's person and found crack cocaine and $1,992.00 in cash. One of the pre-recorded $20 bills was also found on Watson. Officers did not question Watson at the scene, but immediately transported him to the Sheriff's Department.

Shepard and Schuette then conducted a protective sweep of the home to secure their safety. Both officers testified that they did not search the home for contraband, but only for persons. While awaiting the search warrant, the officers secured the home and stood inside the living room of the

residence. Schuette testified that he instructed all of the officers on the scene to remain with him and not to search the home until the warrant arrived. A magistrate judge signed the search warrant at about 5:55 p.m., and Deputy Easter returned to the home with the warrant. The officers first used a K-9 unit to search for narcotics. The dog alerted the officers to narcotics, and crack cocaine, marijuana, heroin, and ecstacy were recovered from the home. Officers also found cocaine inside a beverage can in the freezer and a bloody, loaded .45 caliber semi-automatic pistol underneath the couch in the living room.

Once officers completed the search of the home, Deputy Easter returned to the station. Easter read Watson his *Miranda* rights, but did not have Watson sign anything. At about 10:15 p.m., Watson waived his *Miranda* rights and voluntarily made a statement to Easter admitting knowledge and possession of the firearm and drugs seized from the home. Deputy Easter testified that he did not coerce Watson into making the statement.[1] He also testified that Watson did not ask for food or drink, nor did Watson appear intoxicated at the time of his statement.[2]

On September 13, 2010, Watson filed a motion to suppress evidence seized without a warrant on April 20, 2010. Watson sought suppression of evidence found on his person, evidence found in the home, and his post-arrest statements. The district court granted the motion as to the evidence

---

[1] Deputy Easter initially testified that he did not lie to Watson, but he did tell Watson that his (Watson's) fingerprints were found on the firearm and the drugs, and that the Detroit Police Department had been contacted. Neither of these statements was true at the time.

[2] Watson did state that he consumed ½ of a ½ pint of alcohol prior to his arrest. Watson does not claim he was intoxicated at the time of his statement.

found on Watson's person and denied the motion as to the evidence found in the home. The district court held a second evidentiary hearing to determine if the post- arrest statements should be suppressed. The district court ordered supplemental briefing and ultimately granted Watson's motion to suppress the post-arrest statements. The district court concluded that the warrantless entry into the home and arrest of Watson were purposeful and flagrant and that there was no intervening event sufficient to purge the taint of the illegal entry, and thus Watson's statements were fruit of the poisonous tree and must be suppressed. The district court denied the government's motion for reconsideration. The government now appeals the district court's order granting Watson's motion to suppress his post-arrest statements.

II.

We review a district court's grant of a motion to suppress under a mixed standard of review. Findings of fact are reviewed for clear error, and conclusions of law are reviewed *de novo*. *United States v. Berry*, 565 F.3d 332, 338 (6th Cir. 2009). When a motion to suppress is granted by the district court, this Court reviews the evidence in the light most favorable to the defendant. *United States v. Bailey*, 302 F.3d 652, 656 (6th Cir. 2002).

A. Watson's Arrest

The Fourth Amendment prohibits unreasonable searches and seizures and mandates that "no Warrants shall issue but upon probable cause . . ." U.S. Const. amend. IV. The Supreme Court has

interpreted this as requiring officers to obtain a warrant supported by probable cause before they may lawfully enter a home. *United States v. United States Dist. Ct.*, 407 U.S. 297, 315-16 (1972).

While "searches and seizures inside a home without a warrant are presumptively unreasonable," the Court instructs that without a warrant, "officers need . . . probable cause *plus* exigent circumstances in order to make a lawful entry into a home." *Payton v. New York*, 445 U.S. 573, 586; 590 (1980); *see also Kirk v. Louisiana*, 536 U.S. 635, 638 (2002) (emphasis added). "To be arrested in the home involves not only the invasion attendant to all arrests but also an invasion of the sanctity of the home. This is simply too substantial an invasion to allow without a warrant, at least in the absence of exigent circumstances, even when it is accomplished under statutory authority and when probable cause is clearly present." *Payton*, 445 U.S. at 588-89 (citing *United States v. Reed*, 572 F.2d 412, 423 (1978)).

Based on the controlled buy occurring at the home a short time before the entry, officers did in fact have probable cause to search Lewis's home. Officers also claimed that exigent circumstances existed to overcome the lack of a warrant. The Sixth Circuit defines exigent circumstances as "situations where 'real immediate and serious consequences' will 'certainly occur' if the police officer postpones action to obtain a warrant." *Thacker v. City of Columbus*, 328 F.3d 244, 253 (6th Cir. 2003) (quoting *Ewolski v. City of Brunswick*, 287 F.3d 492, 501 (6th Cir. 2002)). The "need to prevent evidence from being lost or destroyed" constitutes exigent circumstances permitting an officer's warrantless entry into a home. *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006) (holding that police may enter a home without a warrant to "prevent imminent destruction of

evidence"); *United States v. Sangineto-Miranda*, 859 F.2d 1501, 1511 (6th Cir. 1988). Whether exigent circumstances exist in a given situation is not judged by the subjective belief of the officers. *Brigham*, 547 U.S. at 404. "An action is 'reasonable' under the Fourth Amendment, regardless of the individual officer's state of mind, 'as long as the circumstances, viewed *objectively*, justify [the] action." *Id.* (emphasis in original).

Officer Shepard testified that they entered the home based on exigent circumstances because they believed that someone in the neighborhood would alert Watson to Lewis's traffic stop and that Watson would then attempt to flee the home with evidence or destroy evidence before officers could obtain a search warrant. The district court did not credit this argument and aptly stated:

> The Prosecution's argument that "someone" from the neighborhood would send a "heads up" to "someone" at the 808 Second residence is too broad and sweeping of a statement especially since in this instance the man was not from the neighborhood. It *may be*, as testified to by the deputies at the hearing, that the neighborhood is known as a "high crime" area. It *may be* that the neighbors are well known to each other. However, the Court is unable to jump to the conclusion that just because "everyone" in the neighborhood knows "everyone else" in the neighborhood, that "everyone" or "anyone" or "someone" who saw the traffic stop a few blocks from 808 Second, would call "someone," who is *not* from the neighborhood, at 808 Second, to report the traffic stop. This would mean that "everyone" in the neighborhood was in some way aiding "everyone else" or "anyone else" in the neighborhood, in hiding a crime, in this case, distribution of drugs. There was no testimony that anyone witnessed the traffic stop a few blocks away from 808 Second. There is also no testimony that if witnessed, those persons who witnessed the stop knew those who were stopped or knew where they came from or where they lived. The Court finds unreasonable that persons who may have witnessed the traffic stop a few blocks away, would necessarily know what the traffic stop was about and to whom it should be reported. The traffic stop could have very well been a "normal" traffic stop, such as speeding, as opposed to a traffic stop in order to prevent the destruction of evidence from a controlled buy which occurred a few blocks away from 808 Second. How would a person who witnessed a traffic stop a few blocks

away know that it was a result of a controlled buy which occurred a few minutes earlier at that address?

(emphasis in original). The district court correctly found that the officers' belief that exigent circumstances existed to enter the home without a warrant was unreasonable in light of the facts of this case. Since the officers lacked exigent circumstances to enter the home, Watson's arrest was the product of an illegal entry and was therefore unconstitutional. *Payton*, 445 U.S. at 590.

Because the entry into the home violated the Fourth Amendment, Watson's subsequent arrest was unlawful, and his post-arrest statements that flowed from the unlawful arrest are fruit of the poisonous tree and subject to the exclusionary rule. *Id*.

B. Post-Arrest Statements

"In order to make effective the fundamental constitutional guarantees of sanctity of the home and inviolability of the person, ... evidence seized during an unlawful search could not constitute proof against the victim of the search[,] . . . The exclusionary prohibition extends as well to the indirect as the direct products of such invasions." *Wong Sun v. United States*, 371 U.S. 471, 484-85 (1963).

The government relies on *New York v. Harris* to argue that because Watson's post-arrest statements were made at the police department hours after his arrest, the exclusionary rule does not bar their admission. 495 U.S. 14, 21 (1990). *Harris* held that "where the police have probable cause to arrest a suspect, the exclusionary rule does not bar the State's use of a statement made by the

defendant outside of his home, even though the statement is taken after an arrest made in the home in violation of *Payton*." *Harris*, 495 U.S. at 21; *see also United States v. Hudson*, 405 F.3d 425, 439 (6th Cir. 2005). The *Harris* court's holding is premised on the existence of probable cause to arrest prior to entry into the home. *Harris* specifically states that "[b]ecause the officers had probable cause to arrest Harris for a crime, Harris was not unlawfully in custody when he was removed to the station house, given *Miranda* warnings, and allowed to talk." *Id.* at 18. Watson's case is therefore distinguishable on the very grounds on which the *Harris* decision was based.

Officers did not enter Lewis's home with the intent to arrest Watson; they instead entered for the purposes of securing evidence. Given that officers only had probable cause to search Lewis's home but lacked probable cause to arrest Watson, *Harris* does not control. Under *Harris*, if officers lack probable cause to arrest, the arrest is illegal, and the officers' control over the defendant's person then results in wrongful detention. *Harris*, 495 U.S. at 18. Thus, because Watson was illegally arrested and, as a result, wrongfully detained, his post-arrest statements are not admissible absent sufficient attenuation.

C. Attenuation

In *Wong Sun*, the Supreme Court explained the doctrine of attenuation by stating, "We need not hold that all evidence is 'fruit of the poisonous tree' simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is 'whether, granting establishment of the primary illegality, the evidence to which instant objection

is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.'" 371 U.S. 471, 487-88. As such, *Brown v. Illinois* suggests four factors relevant to the attenuation analysis: the voluntariness of a confession, the temporal proximity of the illegality and the evidence at issue, whether intervening circumstances are present, and whether the official conduct was purposeful and flagrant. 422 U.S. 590, 603-604 (1975); *see also United States v. Fofana*, 666 F.3d 985, 993 (6th Cir. 2012).

Thus, the primary inquiry here is whether Watson's post-arrest statements should be admitted into evidence despite the illegal actions of the police because they came "by means sufficiently distinguishable to be purged of the primary taint." *Brown*, 422 U.S. at 599. To determine whether a confession was obtained by exploitation or is sufficiently attenuated from the taint of the illegal arrest, we first look to see if *Miranda* warnings were given and if the resulting confession was an act of free will. *Id.* at 600-02.

i. Voluntariness

While at the police station, Deputy Easter read Watson his *Miranda* rights. Watson waived his rights under *Miranda* and subsequently offered a statement claiming ownership of the gun and some of the drugs found at the home after the search. Watson does not claim that he was forced or coerced into making these statements, and thus, they appear to be voluntary under the Fifth Amendment. *Brown*, 422 U.S. at 601-602; *United States v. Shaw*, 464 F.3d 615, 626 (6th Cir. 2006). Miranda warnings, however, do not, by themselves, "attenuate the taint of an unconstitutional

- 10 -

arrest[.]" *Brown*, 422 U.S. at 602.

ii.  Temporal Proximity

"There is no 'bright-line' test for temporal proximity." *United States v. Wolfe*, 166 F. App'x

228, 234 (6th Cir. 2006) (unreported) (quoting *United States v. Reed*, 349 F.3d 457, 463 (7th Cir.

2003).  Courts have found that, standing alone, as little as two hours of illegal detention to as many

as six hours were insufficient to purge the taint. *Dunaway v. New York*, 442 U.S. 200, 218 (1979);

*Taylor v. Alabama*, 457 U.S. 687, 691 (1982).  Here, Watson was illegally detained for

approximately five hours before his statements were made.  Because the length of detention is not

dispositive, the temporal proximity factor should be considered "in conjunction with any intervening

circumstances."  *Wolfe,* 166 F. App'x at 234; *see Reed*, 349 F.3d at 464.

iii.  Intervening Circumstances

The government argues that the execution of the search warrant for Lewis's home serves as

an intervening circumstance sufficient to purge the taint of Watson's illegal arrest.  Case law does

not support this argument.  The government cites *United States v. Gross*, 662 F.3d 393, 402 (6th Cir.

2011),[3] to support its contention that the executed search warrant weighs in favor of attenuation. The

Government's position is based on a mischaracterization of the *Gross* opinion.  *Gross* specifically

---

[3] The government originally cited *Unites States v. Gross*, 624 F.3d 309, 318-319 (6th Cir. 2010) as authority for this point of law. However, the *Gross* opinion was amended and is now cited as *United States v. Gross*, 662 F.3d 393 (6th Cir. 2011).

states, "We have never adopted ...[the Seventh Circuit's treatment of a warrant as an intervening circumstance] approach as the law of this circuit." *Id.* at 403. Moreover, attenuation in *Gross* was found as it pertained to a DNA swab of the defendant five days after his arrest and only after police obtained a search warrant. Additionally, the defendant in *Gross* voluntarily sought out authorities to give another statement two months after the arrest and a second waiver of his *Miranda* rights. *Id.* That situation is clearly distinguishable from the case at bar where Watson's statements were made after a warrantless entry into the home in which he was staying in the immediate aftermath of his illegal arrest.

The government's reliance on *Hudson v. Michigan*, 547 U.S. 586, 592 (2006), also misses the mark. The government's brief quotes *Hudson* for the proposition that "'[w]hether that preliminary misstep of [illegal arrest] had occurred or not, the officers would have executed the warrant they had obtained, and would have discovered the gun and drugs inside the house.'" (Appellant's Br. at 18) (quoting *Hudson*, 547 U.S. at 592). In *Hudson*, the Supreme Court held that violation of the knock-and-announce rule did not require the suppression of all evidence found in the search. 547 U.S. at 594, 599. The police in *Hudson* already possessed a valid search warrant and were executing it on the residence in question when they violated the knock-and-announce rule. *Id.* at 588. The *Hudson* court indicated that "the knock-and-announce rule has never protected . . . one's interest in preventing the government from seeing or taking evidence described in a warrant[,]" and it also has "nothing to do with the seizure of the evidence, [and thus] the exclusionary rule is inapplicable." *Id.* at 594. In contrast, there was no search warrant at the time officers entered

Lewis's home to arrest Watson. The exclusionary rule is certainly potentially applicable in the face of this Fourth Amendment violation. *See Payton v. New York*, 445 U.S. 573, 577 (1980).

The government further argues that even if they did not have probable cause when Watson was arrested, they surely had it once the search warrant was executed. Officers must have probable cause at the time of the arrest, not afterwards. *Beck v. State of Ohio*, 379 U.S. 89, 91 (1964) ("Whether [the] arrest was constitutionally valid depends in turn upon whether, *at the moment the arrest was made*, the officers had probable cause to make it . . .") (emphasis added).

Given the foregoing, we reject the government's argument that the later-obtained search warrant serves as an intervening circumstance for attenuation.

iv.  Purpose and Flagrancy of Police Misconduct

In determining the purpose and flagrancy of police misconduct, we consider whether the arrest was investigatory by design and execution and also whether the arrest was calculated to "cause surprise, fright, and confusion." *Wolfe*, 166 F. App'x at 236 (citing *Brown*, 422 U.S. at 605). An investigatory arrest is prohibited in the absence of probable cause. *Shaw*, 464 F.3d at 631; *see also Brown*, 422 U.S. at 606 (finding the arrest investigatory because "the detectives embarked upon this expedition for evidence in the hope that something might turn up"). Moreover, a finding of "'purposeful and flagrant' misconduct is not limited to situations where the police act in an outright threatening or coercive manner." *Shaw*, 464 F.3d at 630; *see Dunaway*, 442 U.S. at 218-19.

The district court found that the officers' misconduct was purposeful and flagrant. Purposefulness was found on the basis that officers purposefully entered the home without a warrant, without probable cause to arrest, and lacking exigent circumstances. *Id.* The district court reasoned that the officers' misconduct was flagrant because after they arrested Watson their "full intent . . . was to question him after the search had taken place." *Id.* The district court's conclusion was correct.

In sum, while Watson's post-arrest statements were voluntary, the remaining *Brown* factors do not support a finding that there was sufficient attenuation between the arrest and his statements to purge the primary taint.

### III.

Because officers lacked exigent circumstances to enter Lewis's home without a warrant, Watson's arrest was illegal, and his post-arrest statements were not sufficiently attenuated from the illegal arrest to purge its taint. We therefore affirm the district court's order granting Watson's motion to suppress his post-arrest statements.